UNITED STATES of America,
Plaintiff, Appellee,

v.

Stuart H. NEWTON,
Defendant, Appellant.

UNITED STATES of America,
Plaintiff, Appellee,

v.

Thomas W. GILBERT,
Defendant, Appellant.

Nos. 89–1363, 89–1501.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1989.

Decided Dec. 11, 1989.

As Amended Dec. 15, 1989.

John L. Pollok, with whom Hoffman & Pollok, Charles L. Weintrab, Susan C. Wolfe, and Michael H. Gold, New York City, were on brief, for defendant, appellant.

James H. Leavey, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief, for plaintiff, appellee.

Before BOWNES, BREYER, Circuit Judges and BROWN, Senior Circuit Judge.[*]

BOWNES, Circuit Judge.

Stuart H. Newton (Newton) and Thomas W. Gilbert (Gilbert) were convicted by a jury in the District Court of Rhode Island of conspiring to import marijuana into the United States in violation of 21 U.S.C. § 963; conspiring to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846; importation of marijuana in violation of 21 U.S.C. § 952(a); and possession of more than 1000 pounds of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Newton was also convicted of supervising a continuing criminal narcotics enterprise (CCE) in violation of 21 U.S.C. § 848. All of the charges stem from the importation of 20,000 pounds of hashish[1] from Pakistan into the United States near Jamestown, Rhode Island, on or about July 4, 1983. Appellants

---

* Of the Fifth Circuit, sitting by designation.

1. We assume, as the trial court did without objection, that hashish and marijuana are interchangeable for the purposes of these statutes.

See, e.g., United States v. McMahon, 861 F.2d 8, 10–11 (1st Cir.1988) (treating hashish as marijuana).

raise numerous errors with the trial including evidentiary rulings, governmental misconduct, and other issues. After reviewing the entire record, we find that none of the alleged errors fatally flawed the trial and therefore affirm.

## I. THE EVIDENCE

Briefly, the evidence at trial was as follows.[2] The government relied primarily upon the testimony of Nicholas Kukielski (Kukielski), a participant in the importation who testified pursuant to a cooperation agreement with the government. Kukielski testified that he went to Pakistan with Newton. In Pakistan, Newton was able to obtain 20,000 pounds of hashish, and have it loaded on a freighter. After the ship left Pakistan, Kukielski and Newton flew back to the United States to prepare for the arrival of the drugs.

After returning, Kukielski was introduced to Gilbert by a mutual friend. Gilbert said he could arrange for a fishing boat to meet the freighter, unload the drugs and bring them ashore in Rhode Island. Gilbert secured the use of the boat *Sandra & Cindy*, which brought the drugs ashore. Kukielski observed bait barrels that he had been told contained hashish being unloaded from the *Sandra & Cindy* in the Port of Galilee, Rhode Island. The drugs were taken to a house in Rhode Island, cleaned, repackaged, and distributed. Later Newton gave Kukielski $350,000 to give to Gilbert as payment for the ship, crew and as Gilbert's share of the proceeds. Kukielski gave the money to Gilbert as Newton directed. Based on Kukielski's testimony, the government estimated that the total proceeds from the importation were between $20–24 million.

The government corroborated Kukielski's testimony through other evidence. Kukielski's brother Peter testified that he was paid by Newton to clean and package the hashish. After agreeing to cooperate with the government, the Kukielski broth-

ers placed telephone calls to both of the defendants, which were tape recorded. The taped conversations were admitted into evidence.

A psychologist testified that he had sold Newton the names and the social security numbers of hospitalized patients. The names appeared on passport applications submitted with Newton's and other conspirators' pictures. The applications were admitted into evidence.

The government also presented evidence of large amounts of unexplained cash in the possession of the defendants and of large financial transactions by the defendants (and their relatives and close friends) since the date of the importation.

Finally, the government presented a three-page list of instructions for financial transactions and Swiss bank account numbers seized when Kenneth Bloomfield, an alleged co-conspirator, was arrested in Switzerland (the Bloomfield list). This list tied together various pieces of the government's case and the prosecutor relied heavily on it in his closing argument.

## II. EVIDENTIARY ISSUES

Defendants take issue with two evidentiary rulings of the district court. In reviewing these evidentiary challenges, we keep in mind that a trial court's rulings on relevance and admissibility are reversible only for abuse of discretion. *United States v. Garcia,* 818 F.2d 136, 144 (1st Cir.1987); *United States v. Drougas,* 748 F.2d 8, 24 (1st Cir.1984); *United States v. Sorrentino,* 726 F.2d 876, 886 (1st Cir. 1984).

### A. The Bloomfield List

■ A Swiss police officer testified that Kenneth Bloomfield (an alleged participant) was arrested in Geneva in possession of two passports, both with his picture, one in his name and one in the name of an alias (which, it was shown at trial, was one of

---

**2.** We consider, as we must, the facts in the light most favorable to the government. *United States v. Sturm,* 870 F.2d 769, 770 (1st Cir.1989); *See also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Medina,* 761 F.2d 12, 16 n. 3 (1st Cir.1985).

the names Newton had purchased from the psychologist) and a three-page unsigned and undated typed document that provided instructions on handling financial affairs. The document included a list of names (additional aliases it was proven that Newton used), account numbers and the names of banking officers of various Swiss bank accounts. The government claimed that the document was written by Newton and urged that it be admitted as an admission by a party opponent. The defendants objected claiming that the document was not properly authenticated and was irrelevant.

The judge ruled that the document had enough indicia of trustworthiness to be authentic under Fed.R.Evid. 901(b)(4). He admitted the document pursuant to Fed.R. Evid. 801(d)(2)(A) as an admission of a party opponent. The government used the document in its closing to argue that some of the fruits of the crime were deposited into Swiss bank accounts.

Rule 901 of the Federal Rules of Evidence requires that documents be authenticated or identified before they can be admitted into evidence. Authentication can be achieved through appearance, contents, substance, internal patterns, or other distinctive patterns taken in connection with circumstances. Fed.R.Evid. 901(b)(4)[3]. There are statements in the Bloomfield List from which it could be inferred that Newton authored the document. In particular, the document: refers to "Laura Newton" (Newton's wife) and asks that in the event of the author's death any money should be split between his family and Laura; refers to various aliases proven to be used by Newton ("my lawyer Milton Shapiro ... knows me as Joseph Jaffee"); states, call "Tom" at a telephone number that it was proven was registered in Gilbert's longtime girlfriend's name; and lists bank account numbers next to proven aliases of Newton. Although, as the defendants urge, it is possible that some of the information in the document was known by conspirators other than Newton, Newton was proven to have used the aliases in the Bloomfield list and it is unlikely that anyone would have split money with Laura except Newton.

In addition, despite the defendants' contentions to the contrary, external evidence of the truth of the statements in the document was introduced by the government. Other documents indicated that Milton Shapiro acted as a lawyer for Newton. One of the names and numbers of a Swiss bank account in the Bloomfield list was identical to a number on a piece of paper found in a search of Newton's house. Given the circumstantial evidence of authorship, we do not find that the judge erred in determining that the Bloomfield list was authentic. Having found that the document was authentic, admission of the document as a statement by a party opponent under Fed. R.Evid. 801(d)(2)(A)[4] was proper.[5]

■ Gilbert claims that even if the document was properly admitted against Newton, it was still hearsay to him. The government asserts, and our review of the record reveals, that Gilbert never objected to the admission of the list. "It is axiomatic that the failure to object at trial, absent

---

**3.** Fed.R.Evid. 901 provides in pertinent part that [t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.... By way of illustration only ... the following are examples of authentication or identification conforming with the requirements of the rule:.... (4) **Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

**4.** Fed.R.Evid. 801(d) provides in pertinent part: "A statement is not hearsay if—.... The state-

ment is offered against a party and is (A) the party's own statement...."

**5.** Defendants' citation of *United States v. Drougas*, 748 F.2d 8 (1st Cir.1984) for the proposition that the government must link a document to a specific importation is misplaced. In *Drougas*, the court specifically stated that in ordinary circumstances the information on the document might have been sufficient. But the court went on to say that because the defendants had admitted that they were involved in a number of smuggles, the government had to link the document to the specific smuggle on trial. *Drougas*, 748 F.2d at 26. There was no testimony in this case about other importations.

exceptional circumstances not present here, forecloses any opportunity to challenge the admissibility of the evidence on appeal." *Allied International v. International Longshoremen's Ass'n,* 814 F.2d 32, 39 (1st Cir.1987); Fed.R.Evid. 103(a)(1). Because there was no timely objection, Gilbert waived any objection.

### B. Post-conspiracy Financial Transactions

■ The government introduced into evidence a number of documents showing large purchases, including purchases of various houses and cars by both defendants, and evidence of other financial transactions including bank, mutual fund and brokerage account records from the time immediately following the alleged conspiracy and continuing for the next five years. For example, Gilbert purchased a farm in Pennsylvania with a downpayment of $174,000 paid in $20 bills more than 3 years after the importation.

The government also presented the testimony of an Internal Revenue Service agent who testified that the defendants' tax returns did not show income even close to the level necessary to complete the purchases and transactions. The defendants complain that there was no evidence that the large amounts of unexplained cash were derived from the July, 1983, importation and thus they were irrelevant. In addition, defendants claim that the time between the importation and the purchases was too long to show relevance absent evidence to connect the money and the crime.[6]

It is common ground that the possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking is generally relevant and admissable. *United States v. Ariza–Ibarra,* 605 F.2d 1216, 1225 (1st Cir.1979). *See also* *United States v. Wood,* 834 F.2d 1382, 1386 (8th Cir.1987); *United States v. Collins,* 764 F.2d 647 (9th Cir.1985); *United States v. Chagra,* 669 F.2d 241, 255–57 (5th Cir. 1982), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir. 1975). Furthermore, as we noted in *Ariza–Ibarra,* that is true even if the source of the money is not traced. 605 F.2d at 1225 n. 11. Defendants have cited many cases of drug convictions in which the money was found or financial transactions took place near the time of the drug conspiracy, but have not cited any case that excludes evidence of large cash transactions merely because time has passed and the transaction is no longer relevant.[7] In point of fact, the cases cited seem to imply that the such evidence is relevant anytime after the alleged offense. *See, e.g., Chagra,* 669 F.2d at 256. We do not think, given the large amount of profit derived from this importation, that five years after a crime is too long to destroy the relevance, as a matter of law, of the possession and use of large amounts of unexplained money.

The defendants claim that the evidence of the financial transactions should only have been admitted if there was a showing of special relevance because "the issue in this case was the credibility of the government's two accomplices [the Kukielskis]." We disagree. The basic issue in the case was not the credibility of the government's witnesses, that was only a subsidiary issue. The pivotal issue was whether the government could prove beyond a reasonable doubt that the defendants had conspired to, and did, import large amounts of marijuana into the United States. The possession of large amounts of unexplained cash and other financial transactions are relevant to prove those charges. We also recognize,

---

6. We note in passing that, although the record is somewhat unclear, much of the evidence of the financial transactions that defendants complain of was not objected to at trial and therefore the objections are waived. Rather than consider each bit of evidence individually, we follow defendants' lead and consider them together.

7. Defendant's reliance on *United States v. Zarintash,* 736 F.2d 66, 71–72 (3d Cir.1984) is mis-placed because the conspiracy at issue in *Zarintash* never was completed (the boat sank with the drugs in it), and therefore there was no money gained. The court held that to admit large amounts of money connected to the defendants, that could not relate to the crime for which they were on trial, was evidence that showed "bad character" of the defendant only and was, therefore, inadmissible.

of course, that the government, in order to prove the CCE count against Newton, had to show that Newton received substantial income from the conspiracy. *Chagra*, 669 F.2d at 256.

Finally, the defendants contend that the government is investigating other alleged drug importations by the defendants that are more likely to be the source of the money. Defendants argue that because of these other investigations the government must prove that the unexplained money came from the July, 1983 importation. But "the suggestion ... that the large amounts of cash were from another illegal activity ... goes to weight and not admissibility of the evidence...." *Tramunti*, 513 F.2d at 1105.

The district court did not abuse its discretion in admitting the evidence of the financial transactions.

### III. IMMUNIZED WITNESS INSTRUCTION

■ The defendants contend that the judge committed reversible error by failing to give an accomplice witness instruction or, at least, the instruction defendants requested.[8] Interestingly, after the jury charge, none of the parties could even remember if the substance of the instruction had been given. Thus, we are skeptical of Newton's contention that the bench conference that occurred after the charge was sufficient notice to the judge that he was objecting to the charge.[9] Newton's lawyer certainly did not object to the specific words of the instruction given and therefore the instruction may only be attacked if there was "plain error." Fed.R.Crim.P. 52(b). Defendants may not rely upon a general objection and the fact that they submitted a request to discharge their obligations under Fed.R.Crim.P. 52(b). *United States v. Capone*, 683 F.2d 582, 588 (1st Cir.1982). Moreover, if he did object properly, the jury instructions were not reversible error.

■ The failure to give a requested jury instruction is reversible error only if the [requested] instruction (1) is substantially correct; (2) was not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense. *United States v. Williams*, 809 F.2d 75, 86 (1st Cir.1986) (*quoting United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.1984), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984)). As this court has noted before, although an accomplice witness instruction is advisable when there is accomplice testimony, its absence does not require reversal. *United States v. Olmstead*, 832 F.2d 642, 647 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988); *United States v.*

---

8. The Defendants requested an instruction that included the following:

> The law imposes upon you stringent requirements as to how to evaluate accomplice testimony before concluding it is reliable.... The law requires that you scrupulously examine an accomplice's motives in persuading the government to accept him as a witness rather than prosecuting him as a defendant, so you can make sure he has neither made up a story to incriminate someone nor colored facts of an otherwise true story to make someone appear to be more guilty than he actually is.

The Judge charged the jury that:

> Another factor you can take into account is the witness' stake in the outcome of the case. Does the witness have anything to gain or lose by his testimony? ... Now, the testimony of a witness who provides evidence against a Defendant for immunity from punishment or for some other personal advantage must be examined by you and weighed by you with particularly great care, a little more care than you would weigh the testimony of an ordinary witness. It certainly does not mean you should disbelieve the witness' testimony. It simply means that you ought to consider that kind of witness' testimony even more carefully than you would consider the testimony of any other witness....

9. MR HOFFMAN: Secondly your honor gave a charge concerning I think—I frankly, I don't remember, concerning immunized witnesses concerning testimony of an accomplice.

MR. LEAVEY (prosecutor): It was both.

MR. ZIMMERMAN (Gilbert's Lawyer): He did. And Accomplices.

MR. HOFFMAN: Okay. I thought you may have missed one.

But if they were both in, I won't ask for any further charge. App. at 1570.

*Wright,* 573 F.2d 681, 685 (1st Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). None of the cases cited by counsel, nor any that we could find, stand for the proposition that the failure to give an accomplice instruction constitutes reversible error. *See, e.g., United States v. Swiderski,* 539 F.2d 854, 859–60 (2d Cir.1976) (judge should give charge on testimony of accomplices and informers, but not necessarily reversible error not to); *United States v. Daniels,* 558 F.2d 122, 127 (2d Cir.1977) (preferable that a charge be given); *United States v. Leonard,* 494 F.2d 955, 960 (2d Cir.1974) (dicta that refusal to give requested instruction is reversible error but failure to give without request is not plain error). The question is not whether "the trial court failed to isolate and cure a particularly ailing instruction but whether the ailing instruction by itself so infected the trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). We find that it did not.

Furthermore, jury instructions must be interpreted as a whole. *United States v. Pitocchelli,* 830 F.2d 401, 404 (1st Cir. 1987). Any particular instruction must be evaluated in the context of the entire charge. *Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400–01; *United States v. Morris,* 700 F.2d 427, 433 (1st Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983).

The district court gave the substance of the requested charge by instructing the jury to be aware of any interest that a witness might have and to examine the testimony of witnesses testifying under immunity with particularly great care. There is no significant distinction between a cautionary instruction on the testimony of an accomplice and a cautionary instruction on a witness granted immunity. *United States v. Hickey,* 596 F.2d 1082, 1091 & 1091 n. 6 (1st Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979) (court's instruction cautioning jury with respect to *informant* testimony held adequate where request was one cautioning jury against *accomplice* testimony). In both instances, the jury is instructed that the testimony must be received with caution and weighed with care. Consequently, whether we treat the government witnesses as accomplices or as persons granted immunity, or both, is immaterial because the instruction would be the same. *United States v. Morgan,* 555 F.2d 238, 243 (9th Cir.1977) (cited with favor in *Capone,* 683 F.2d at 588). The charge as given did not deny defendants any substantial rights.

Defendants also argue that by failing to give the instruction they requested, the judge failed to charge on a defense theory of the case. Defendants use "defense theory" in a broad sense to mean that their trial strategy was an attempt to undermine the credibility of the Kukielski brothers. The charge that was given amply put that issue before the jury. While it is true that a trial court must instruct a jury on a defense theory that is sufficiently supported by both the evidence and the law, the judge is not required to give the exact instructions proposed. *Olmstead,* 832 F.2d at 647–48 (*citing United States v. Sommerstedt,* 752 F.2d 1494, 1496 (9th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 149, 88 L.Ed.2d 123 (1985)); *United States v. Dyer,* 821 F.2d 35, 38–39 (1st Cir.1987); *United States v. Zeuli,* 725 F.2d 813, 817 (1st Cir. 1984); *United States v. Morris,* 700 F.2d 427, 433 (1st Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983). Furthermore, defendants cannot couch their requested instructions as "defense theories" and expect to get them read verbatim to the jury. *United States v. Turkette,* 656 F.2d 5, 11 n. 3 (1st Cir.1981). The instruction in substance told the jury exactly what the defendants wanted to convey: examine the testimony of accomplices more carefully than other witnesses.

## IV. ADMISSION OF PLEA AGREEMENTS

■ Defendants ask us to reconsider our long-standing rule that the entire plea agreement of a government witness may be placed before the jury. *See, e.g., United States v. Martin,* 815 F.2d 818, 821 (1st Cir.), *cert. denied,* 484 U.S. 825, 108 S.Ct.

89, 98 L.Ed.2d 51 (1987); *United States v. McNeill*, 728 F.2d 5, 14 (1st Cir.1984); *United States v. Winter*, 663 F.2d 1120, 1134 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983). We refuse to do so. As we stated in *Martin*,

> Such agreements may often, as in the present case, point in different directions: a warning therein that the defendant will be prosecuted for false testimony enhances his credibility as a witness, but the rewards promised in the same document may undermine his credibility by showing that he stood to gain from incriminating others.... Only by viewing the entire agreement can the jury get the whole picture, from which to assess, as best it can, the probable motives or interests the witnesses could have in testifying truthfully or falsely.

*Martin*, 815 F.2d at 821. Other courts of appeal have the same rule. *See United States v. Townsend*, 796 F.2d 158, 162–63 (6th Cir.1986); *United States v. Binker*, 795 F.2d 1218, 1222–23 (5th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987); *United States v. Dennis*, 786 F.2d 1029, 1046 (11th Cir.1986), *reh'g granted in part and denied in part*, 804 F.2d 1208, *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); *See also United States v. Craig*, 573 F.2d 513, 519 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978).

## V. CONTINUING CRIMINAL ENTERPRISE

■ Newton was also convicted of being a supervisor or organizer of a continuing criminal narcotics enterprise in violation of 21 U.S.C. § 848. A conviction on this count requires that the government prove that the defendant (1) committed a drug offense punishable as a felony; (2) as part of a continuing criminal enterprise; (3) in which the defendant committed a series of drug offenses in concert with five or more persons with respect to whom the defendant acted as supervisor, organizer, or manager; and (4) obtained substantial income or resources from the drug violations. *Garrett v. United States*, 471 U.S. 773, 781, 105 S.Ct. 2407, 2412–13, 85 L.Ed.2d 764 (1985); *See also*, 21 U.S.C. § 848(b). Newton contends that under the third part of the *Garrett* standard, the jury must agree on the identities of the five individuals who are supervised.[10]

■ Newton's argument finds no support in the language of the statute, nor in precedent. We have held that a jury is not required to determine the identity of the other individuals involved. *United States v. Tarvers*, 833 F.2d 1068, 1073–75 (1st Cir.1987). *Tarvers*, which we reaffirm, is consistent with cases decided by other courts of appeal that have had occasion to consider the same issue. *United States v. Moya–Gomez*, 860 F.2d 706, 747 (7th Cir. 1988); *United States v. Possick*, 849 F.2d 332, 337 (8th Cir.1988). We have found no authority, and none has been cited by counsel, that interprets the statute differently.

## VI. GOVERNMENT MISCONDUCT

Finally, the defendants raise three instances of what could broadly be called governmental misconduct. None of them rise to the level of reversible error.

### A. Government's Witness Takes the Fifth.

■ The government called Michael Celeberto (Celeberto), a crew member of the *Sandy & Cindy*, to testify about the boat's use on or about July 4, 1983. Prior to calling Celeberto, the prosecutor acknowledged to the judge and defense counsel that Celeberto might not testify but indicated that he did not think Celeberto would invoke the fifth amendment. Newton's attorney requested that Celeberto be examined outside the presence of the jury. The judge denied the request.

---

**10.** The district court, in his instructions to the jury, stated that because "this requirement is designed to define the size of the enterprise, it is not necessary for you to agree as to the identities of the five individuals, however it is necessary that you unanimously find that there were at least five other individuals involved."

When Celeberto took the witness stand, he answered a few introductory questions, and then was asked if he had testified before the grand jury. He said no. Upon being shown a transcript of his grand jury testimony, Celeberto continued to deny that he had testified. The prosecutor continued the examination by asking Celeberto about his work on the *Sandy & Cindy*. Celeberto admitted that he knew Gilbert and identified him in the courtroom but denied having a conversation with him in late June or early July of 1983. When asked about an "unusual use" of the *Sandy & Cindy* in the same time period, he exercised his fifth amendment privilege against self-incrimination and refused to answer.

The judge immediately excused the jury. When the jury returned they were given a cautionary instruction that "you should infer nothing from the last witness's indication of unwillingness to testify or to answer any particular question that was put to him." The judge did not give a cautionary instruction specifically on the fifth amendment. Defendants contend that they were denied their right to cross-examination.

Our inquiry focuses on two questions: whether the government made a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege, and whether the inferences from the refusal to testify add critical weight to the prosecutor's case. *Namet v. United States*, 373 U.S. 179, 186–87, 83 S.Ct. 1151, 1154–55, 10 L.Ed.2d 278 (1963).

There was certainly reason for the prosecutor to believe that Celeberto not only might not testify but also might exercise his fifth amendment privilege. The prosecutor told the court that Celeberto was reluctant to testify, and in fact had been refusing to testify because he was worried about being the "stand up guy." Under the circumstances, the witness should first have been questioned outside of the presence of the jury. But, the prosecutor did not attempt to use Celeberto's brief appearance as a witness to the government's advantage; he did not refer to it in his closing or at any other time during the trial.

We do not think that the prejudice from Celeberto's brief appearance on the witness stand rose to the level of reversible error. The prejudice, if any, to Newton was minimal because the witness neither identified him nor added anything to the case against him. There is little merit in Newton's contention that Celeberto's refusal to testify reflected badly on his own refusal to testify.

Arguably, Celeberto's invocation of the fifth amendment added weight to the prosecutor's case against Gilbert. The jury might have tied Celeberto's fear of self-incrimination to Gilbert. Conversely, by denying that he had ever met or discussed the use of the *Sandy & Cindy* with Gilbert, Celeberto supported Gilbert's position that he had nothing to do with the boat on the days in question. Given the other evidence presented against Gilbert, the short length of the examination of the witness, and the fact that the government never referred to Celeberto's testimony throughout the trial, we cannot say that the witness's refusal to testify further was unduly prejudicial.

B. Did the Prosecutor Improperly Invoke the Credibility of the Government

■ In his closing argument, Newton's attorney insinuated that the government was "embarrassed" because it had no evidence against Newton. The government was going forward, he argued, because it could rely on the jury to determine if Newton was guilty or not. While defense counsel did not accuse the government lawyers of lying, he certainly implied that the government was prosecuting a meritless case and, in essence, that the government was framing the defendants.

In his rebuttal, the prosecutor stated: There was one overriding tone to Mr. Hoffman's summation and that was that the government is in some sort of conspiracy here to prosecute and to convict two innocent people. There was talk about embarrassment to the government if we don't prove our case.... In fact the statement was made that we would

put anyone on trial and we could justify it because the jury decides. If you believe that, ladies and gentlemen, throw the case out. If you believe that the government, the United States government of which we are all part is framing these people, don't hesitate, don't make them wait. Just throw the case out. A. 1501–1502.

The defendants claim that in this statement that the prosecutor impermissibly used the government's credibility to strengthen its case against the defendants, thereby depriving them of a fair trial. Defendants rely primarily on *United States v. Gonzalez–Vargas*, 558 F.2d 631 (1st Cir. 1977), where we reversed a conviction because the prosecutor had inserted his own credibility into the closing argument. In that case, the prosecutor stated his personal belief that the defendants were guilty four times in a very short closing argument and at least once in rebuttal. After the first instance, the defendant objected, and the court ruled the statements were permissible. *Gonzalez–Vargas* was a much more flagrant case than the one before us because the prosecutor's self-serving credibility statements dominated the closing. He injected his personal views into the case, although he was completely unprovoked and there were no other extenuating circumstances.

The government asserts that the statements made by the prosecutor in his rebuttal were merely an invited response to the defendant's attack relying, on *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In *Young*, the Court ruled that "the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.* at 12, 105 S.Ct. at 1045.

We have repeatedly stated that government attorneys must not use the tremendous personal credibility that inures to them because they represent the government. *Gonzalez–Vargas*, 558 F.2d at 633. But we have also recognized that even the misuse of that power is not necessarily reversible error. *Id.* at 633 (and cases cited therein). One extenuating circumstance that we have consistently recognized is provocation by the defense. *Id.*

Although we do not condone even minor impermissible statements by prosecutors,[11] taken in context of the entire closing, and in response to the main thrust of defendant's argument, the prosecutor's remark was not reversible error. The infraction was relatively minor and did not unfairly prejudice the defendant. In addition, the judge gave a corrective instruction that the jury should not give the prosecutor undue credibility simply because he represented the government.

C. Failure to disclose Jencks Act material.

At the end of the direct examination of Nicholas Kukielski, the defendants requested that the government produce all material that must be disclosed under the Jencks Act, 18 U.S.C. § 3500. The Jencks Act requires that the government produce any "statement" of a prosecution witness in its possession that relates to the subject matter upon which the witness testified. 18 U.S.C. § 3500(b). A Jencks Act "statement" includes

(1) a written statement made by ... the witness and signed or otherwise adopted or approved by him; (2) ... a substantially verbatim recital of an oral statement made by ... the witness and recorded contemporaneously with the making of such oral statement; or (3) a state-

---

**11.** Neither this ruling nor our ruling on the prior issue in any way lessens the high standard to which the United States Attorney must be held. As we have emphasized before:

the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest,

therefore, in a criminal prosecution is not that it shall win a case but that justice shall be done..... It is as much his duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one.

*United States v. Capone,* 683 F.2d 582, 585 (1st Cir.1982).

ment, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). The government produced some documents but indicated that other documents were not Jencks Act statements. One of the documents withheld was the notes of the FBI agent who interviewed Kukielski. Defendants asked the judge to determine whether the FBI notes were "adopted" by the witness and were thus Jencks Act statements. 18 U.S.C. § 3500(e)(1). The district court ruled, after a short hearing, that the notes were not adopted by the witness. *See, e.g., United States v. Gonzalez–Sanchez,* 825 F.2d 572, 586–87 (1st Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987) (discussing witness interview notes as statements within the meaning of § 3500(e)(1)). The defendants do not dispute that ruling. They now claim that it was error for the judge not to inquire whether the notes were "substantially verbatim" statements by the witness. 18 U.S.C. § 3500(e)(2). They ask that the case be returned to the district court for a determination of whether the notes were verbatim oral statements within the meaning of 18 U.S.C. § 3500(e)(2).

We decline to do this for two reasons. First, the defendants did not raise this objection with the trial judge; therefore the objection was waived and can only be reversed for plain error. Defendants only conducted voir dire on whether the witness had "adopted" the contents of the notes. In the voir dire, it became clear, as the judge ruled, that the witness had not adopted the notes. Nothing that was asked in the voir dire, nor anything said by the witness, could have put the judge on notice that defendants were also claiming that the notes should have been produced because they were verbatim statements. An exception on one ground cannot serve as the basis for another, on a different ground, on appeal. *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 809 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).

Defendants claim that the judge had an affirmative duty to inquire as to whether the statements were verbatim. Although there is language in some cases that the trial judge, in certain limited situations, might have an affirmative duty of inquiry, that duty only arises when counsel has raised an issue that would require further inquiry by the judge. *Saunders v. United States,* 316 F.2d 346 (D.C.Cir.1963), *cert. denied,* 377 U.S. 935, 84 S.Ct. 1339, 12 L.Ed.2d 299 (1964). *Saunders* only stands for the proposition that the court should make an inquiry if it is necessary for a proper ruling. The district judge here had no duty to inquire into that issue unless it was presented by counsel.

Moreover, the material here is not a verbatim record within the meaning of § 3500(e)(2). Although § 3500(e)(2) incorporates more than mechanical reproduction of statements, the intent of the section was to require production of "the witness' own words ... fully and without distortion." *United States v. Foley,* 871 F.2d 235, 239 (1st Cir.1989) (*citing Palermo v. United States,* 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959)). Nothing in the record indicates that Agent Parham created a verbatim record. For example, there was no testimony that the agent was recording the exact words of the witness. Although the agent, in the evidentiary hearing held by the judge, did say that he had asked the witness occasionally if he had "gotten it right," that does not mean that he was recording the conversation. *See, e.g., Gonzalez–Sanchez,* 825 F.2d at 586–87 (*quoting Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976)) (reading statement back to the witness does not necessarily mean that it was adopted). The production of the notes was properly denied.

Defendants' other contentions do not merit consideration.

AFFIRMED.