UNITED STATES of America,
Appellee,

v.

Peter SIMONELLI, Defendant,
Appellant.

No. 00–1326.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 2000.

Decided Jan. 19, 2001.

Alan M. Dershowitz, with whom Victoria B. Eiger and Dershowitz, Eiger & Adelson, P.C., were on brief, for appellant.

Michael E. Karam, Attorney, United States Department of Justice, with whom Paula M. Junghans, Acting Assistant Attorney General, Donald K. Stern, United States Attorney, Robert E. Lindsay and Alan Hechtkopf, Attorneys, United States Department of Justice, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Peter Simonelli, a successful business man, was convicted by a jury of filing false federal income tax returns for the years 1991 and 1992, of aiding and abetting the filing of false tax returns for his company, Eastford Tool and Die Co., Inc., and of conspiracy. *See* 26 U.S.C. § 7206(1). The estimated tax loss to the government was $457,586. He was sentenced to 30 months in prison, a term which he is now serving, and fined half a million dollars. His appeal results in our resolving for the first time several issues under the Federal Rules of Evidence.

## I.

The prosecution theory was that Simonelli actually had income in excess of a million and a half dollars over the two years, but reported income for himself of only $84,245 and $141,701 respectively in those two years. The corporation reported ordinary income of $7,925 and $92,783 respectively for those years. The government presented evidence that during this period, Simonelli spent considerable sums on the acquisition and renovation of an expensive home, the Wells estate, and had other expenses well beyond his reported income. His company purchased a ski chalet and a health and racquet club, as well as interests in a country club, for the benefit of Simonelli and his family. These advances were not reported either as personal income to Simonelli or as a loan to him. In addition, the company made payments to Simonellis parents on Simonellis personal debt to them for a buyout of their interest in the company. Much of this was made possible, the government contends, because Simonelli diverted company funds to personal use by falsely claiming the expenditures as corporate expenses. The company's income (and pass through to shareholders, as this was a subchapter S corporation) was falsely reduced by the company's two accountants through a set of improperly adjusted journal entries and the falsification of two accounts payable. As a result, Simonelli understated his income and his tax liability, as well as that of the company.

The defense theory was that Simonelli relied on the advice of his accountants as to his taxes. As to why the accountants would have an incentive to prepare false books and tax returns for an innocent client, the defense theory was that the accountant, Baker, was himself in bad financial straits, needed the income from his work for Simonelli, and wanted to keep his client happy. The jury convicted.

Simonelli now says that both the conviction and the sentence are in error. The conviction must be set aside, he says, because of three errors in admission of evidence, errors which cumulatively, at least, were not harmless. He also says the district court erred by failing to instruct the jury with respect to accomplice testimony. Finally, he says that even if he was rightfully convicted, the sentence was in error because of a miscalculation of the base offense level and an improper upward departure on the amount of the loss. The appeal requires resolution of questions about the limits of admissibility of evidence under Rules 608, 106, and 801, Fed. R.Evid., and common law doctrines con-

cerning prior consistent statements. We decide a question previously undecided by this circuit about the reach of Rule 801, Fed.R.Evid., when prior consistent statements are offered not for their truth but to buttress the credibility of a witness previously impeached with prior inconsistent statements.

## II.

### 1. *Claimed Evidentiary Errors*

Simonelli, on appeal as at trial, portrays this case as one which turned on whether the jury believed Simonelli's story that he was a busy man who left tax matters to his accountants, or believed the accountant Baker's testimony that Simonelli instructed him to hide the use of company monies and to make false entries, intending to cheat the government on taxes. In that credibility contest, Simonelli argues, there were three evidentiary errors which had the effect of improperly bolstering Baker and improperly portraying Simonelli as a bad man, who, among his other sins, treated his own father poorly.

### A. *Cross Examination of Defendant on Other Acts: Rule 608*

Simonelli's business, Eastport, was a tool and die company. Its largest customer was Pratt & Whitney, with at least 75 percent of Eastport's business coming from that company.

Simonelli was cross-examined about his relationship with Pratt & Whitney in ways that called into play the strictures of Rule 608, Fed.R.Evid. That rule "is centrally concerned with character for veracity, a mode of accrediting or discrediting the witness that is based on the same 'propensity' reasoning of Rule 404 [which prohibits prior bad acts evidence] but is subject to quite different rules. Rule 608 permits accrediting or discrediting by opinion or reputation evidence as to character for veracity, Rule 608(a), and, on cross-examination only, by inquiry into specific instances of conduct 'if probative of truthful-

ness or untruthfulness.'" *United States v. Cudlitz*, 72 F.3d 992, 996 (1st Cir.1996) (quoting Fed.R.Evid. 608(a)).

On cross-examination of Simonelli, the government was permitted to ask Simonelli a series of questions about Pratt & Whitney over the Rule 608 and 403 objections of defense counsel. Simonelli said he understood there was a policy prohibiting gratuities which would prevent the giving of a gift to a buyer at Pratt & Whitney who would be in a position to place orders for the company. The prosecutor was permitted, under Rule 608, to ask:

> [I]sn't it a fact that your contract with Pratt & Whitney was canceled because Pratt & Whitney determined that you had violated [their] gratuity policy.

Simonelli admitted this was so. Later, on questioning from his own counsel, Simonelli explained that he had given a pool table as a wedding present (as well as some lumber) to a friend who worked for Pratt & Whitney. Simonelli testified that he received no business in return and that the friend was not in a position to place orders. He also testified that he had fully cooperated with Pratt & Whitney's investigation and had been assured that his company would not be cut off from business with Pratt & Whitney, and so he was shocked when that happened. He attributed Pratt & Whitney's actions to pressure from the IRS.

Later questions followed, including whether Pratt & Whitney had audited Eastern on a large contract and had found Simonelli and his minions altering time cards, all of which Simonelli denied. Simonelli's counsel then asked for an instruction that the questions were not evidence, to which the court replied that it would so "instruct the jury appropriately at the time." Simonelli then was asked about another contract and whether he had ever made up fictitious labor hours to get more money from Pratt & Whitney than was due for the time actually spent on performing the contract. He denied that. He was also asked whether he (and one of

Baker's partners) had removed records from Eastern and then told the Pratt & Whitney investigator the documents were unavailable because there had been a fire. Simonelli denied this.

Simonelli now challenges all of these questions on the basis that the mere violation of a company gratuity policy is not evidence probative of untruthfulness, admissible in the discretion of the court under Rule 608, and that the questions were so prejudicial they should have been excluded under Rule 403. The government makes the unhelpful response that it is permitted to ask leading questions on cross-examination, and the more helpful response that violation of a gratuity policy is like bribery, and that bribery evidence has, in most circuits, been deemed admissible under Rule 608. This court has not yet decided whether bribery is a crime going to untruthfulness for Rule 608 purposes.

At issue in this case is admissibility under the second sentence of Rule 608(b), where a principal witness's truthfulness is being attacked by asking the witness about specific instances of conduct. *See id.* (specific instances of conduct "may, . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . .").[1] The trial court is required under the rule to balance the probative value of specific instance evidence against the potential dangers and costs of the evidence as recognized in Rules 403 and 611. *See* Fed.R.Evid. 608 (advisory committee's note); 28 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence* § 6118, at 94 (1993). Since the defense never asserted that the government did not have a good faith basis to ask the questions, the question of whether such basis exists is not an issue. *Cf. United States v. Grajales–Montoya*, 117 F.3d 356, 362 (8th Cir.) (prosecutors must have good faith basis for

questions asked during cross-examination of a defendant), *cert. denied*, 522 U.S. 1007, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997).

■ The cross-examination questions at issue are not fungible, and must be analyzed individually. The questions about altering time cards, inflating bills, and stealing away with records, all of which Simonelli denied, were about prior bad acts that tended to show untruthfulness. That Simonelli denied these acts does not, of course, render the questioning harmless. There is a lingering odor left by such questions, and so we continue the analysis.

■ We conclude the inquiry was proper. The discretion of the district court under Rule 608 is guided by several factors, including whether the instances of prior untruthfulness bore some similarity to the conduct at issue, whether or not they were remote in time, whether they were cumulative of other evidence, and whether there was some likelihood they happened. *See United States v. Mateos–Sanchez*, 864 F.2d 232, 236 (1st Cir.1988) (questions about specific instances of conduct must be "clearly probative of truthfulness" and not remote in time); *see also United States v. Sutherland*, 656 F.2d 1181, 1198 (5th Cir.1981) (merely cumulative evidence not admissible under Rule 608). Applying these factors here, there was no abuse of discretion in admitting the evidence under Rule 608. *See United States v. Bartelho*, 129 F.3d 663, 675 (1st Cir.1997) (applying abuse of discretion standard), *cert. denied*, 525 U.S. 905, 119 S.Ct. 241, 142 L.Ed.2d 198 (1998); *Tigges v. Cataldo*, 611 F.2d 936, 938 (1st Cir.1979) (same). There is no basis to distrust the trial judge's Rule 403 determination.

■ Nor was there an abuse of discretion in the trial judge's decision not to interrupt the flow of the cross-examination

---

1. There was no effort by the government to introduce extrinsic evidence after Simonelli denied each instance.

to instruct the jury that the questions were not more than questions. The trial court gave such an instruction at both the start of the trial and at the close of the evidence. This is largely a judgment call by the trial judge and we see no reason to disturb that judgment. *See United States v. Palmer*, 203 F.3d 55, 59 (1st Cir.) (district court has "considerable leeway" as to timing of curative instruction), *cert denied*, — U.S. —, 120 S.Ct. 2756, 147 L.Ed.2d 1018 (2000).

■ A different issue is posed by the first question, which was about violation of the company's gratuity policy. Here, we agree that admission of this evidence was error. We ground our conclusion on the facts that there was no showing to the court of the content of the anti-gratuity policy or whether the alleged violation bespoke of untruthfulness and otherwise met the tests for weighing discretion under Rule 608 outlined above. As the defense has ably argued, there are anti-gratuity policies and then there are anti-gratuity policies. It may violate an anti-gratuity policy to give a holiday tip to a doorman, or to give a gift to a friend who happened to work for an important business contractor, but whose job would not permit the friend to send work in the direction of the giver. There are too many factual variations possible to say that a violation of a gratuity policy by itself qualifies as an instance of untruthfulness under Rule 608.

Taken alone, the error amounted to little, because Simonelli testified about the circumstances of the gift of the pool table and lumber and that it had no effect on his business, so it could not have been the equivalent of a bribe. The error, thus, was hardly strong evidence of lack of truthfulness. We consider later the cumulative effect of the alleged errors.

**2.** Simonelli refers to King Lear, Act I, Scene 4, 311–312, where Lear speaks about Goneril, the daughter whom he thinks has not honored an agreement:

### B. *Testimony of Simonelli's Father for the Prosecution*

■ As evidence in support of its theory that Simonelli had the company pay his personal debts and then did not report the payment as income or a loan to himself, the prosecution presented testimony from Simonelli's father, Henry. The evidence was relevant.

Henry had retired in 1986 from the company and he and his wife were owed sums for their ownership interest. Simonelli owed his parents approximately $990,000, a new automobile, and insurance under a 1988 written buyout agreement, reached when Simonelli failed to honor his first agreement with his parents. Henry testified that he received some payments from Simonelli and that his understanding was that Simonelli was not supposed to be reimbursed by the company for the payments. Checks were introduced showing payments from the company to Simonelli at the same time (or before) and in the same amounts as the payments Simonelli made to Henry, thus tending to establish that exactly such reimbursements were made. Henry also testified that he understood the agreement to mean that Simonelli could not sell or otherwise dispose of collateral of the company other than in the ordinary course of business. He said that his son had bought real property using company funds without first discussing it with Henry or receiving Henry's permission.

On cross-examination, Henry was shown not to recall many details and the defense theme was developed that the sum Simonelli and his brother owed to their parents came down to the lesser amount of $148,000 and that Simonelli had offered to pay that amount.

On appeal, Simonelli says that he was placed in an impossible situation, a family tragedy of Shakespearean proportions.[2]

How sharper than a serpent's tooth
it is to have a thankless child.
Shakespeare provides the response, later in that play:

He could not, he says, effectively cross-examine his own father. Despite these appellate protestations, there was an effective cross-examination, which showed the father to be confused about some dates and particulars.[3] Simonelli's second argument is that Henry's testimony was simply wrong in the particulars. That was for the jury. The third argument is that on redirect, Henry revealed that he lived in a mobile home and had been financially embarrassed when his car had been twice repossessed, at the times Simonelli stopped making the payments owed under the 1988 agreement and earlier. This, Simonelli argues, was irrelevant and an attempt to bias the jury by painting him as "an ungrateful and heartless son" in contrast to "an abused and sympathetic father who was ... responsible for the company's, and thus his son's, financial success."

On redirect the prosecution picked up the defense's theme about the sums still owed, establishing that the payments had stopped at least two years prior and that Henry was still owed those sums. To buttress that point, the prosecutor established that Henry lived in a mobile home and twice had had his car repossessed. Although objection was made to some of this evidence, there was no abuse of the trial court's discretion under Rule 403 in admitting the testimony, much less was plain error committed as to the evidence to which the defense did not object. While not the most attractive examination by the government, it was the defense that had played the theme that only smaller sums were owed and that Simonelli had offered to pay them, which may have suggested there was little impact on the father. The government countered that theme, and we cannot say there was an abuse of discretion in admitting the evidence.

### C. Prior Consistent Statements of the Accountant: Rule 801

Simonelli complains about the prosecution's use of Baker's grand jury testimony to bolster Baker's credibility on redirect by showing that Baker made statements to the grand jury consistent with his trial testimony, after Baker on cross-examination had been shown to have made some statements to the grand jury inconsistent with his trial testimony. Baker also admitted on cross that he had lied in some testimony to the grand jury. Simonelli says that this situation is governed by Rule 801(d), Fed.R.Evid., Fed.R.Evid. 801(d)(1)(B)[4] and the evidence must be excluded because it did not comply with the conditions of the rule.[5] The government responds that the evidence is admissible under Rule 106, Fed.R.Evid., the rule of completeness. Neither of them is entirely right.

We set the context. Baker's testimony on direct supported the government's case, and is largely described elsewhere in this opinion. On cross-examination it was established that Baker had committed perjury several times, first in his initial testimony to the grand jury in 1995. For ex-

---

To willful men,
The injuries that they themselves procure
Must be their schoolmaster
King Lear, Act II, Scene 4, 305.

**3.** It is a legislative policy judgment whether to curtail the authority of prosecutors to question family members and Simonelli has offered nothing to suggest the legislature intended to limit such examination.

**4.** Rule 801(d) provides in relevant part:
(d) Statements which are not hearsay. A statement is not hearsay if—
(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ...
(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive
Fed. R. Evid. 801(d)(1)(B)

**5.** There has been extensive commentary on the issue and the inconsistencies within the Rule, which we will not repeat. See generally M. Graham, *Federal Practice and Procedure: Evidence* § 7012; C. Mueller & L. Kirkpatrick, 4 *Federal Evidence* § 406 (2d ed.1994).

ample, Baker had told the grand jury that he understood certain tax returns, which were never submitted to the IRS and which showed a much higher personal income for Simonelli, were for internal company use only. The testimony was false because Baker knew the returns were going to be submitted to Merrill Lynch in support of Simonelli's effort to get financing to purchase some property. At the time of this grand jury testimony Baker and Simonelli had the same counsel and Baker came to think that situation created a conflict for the lawyer.

Baker then retained new counsel and reached an agreement to cooperate with the government; the agreement required him to tell the truth. Baker was debriefed by the government and again said that Simonelli did not tell him how the unusual tax return would be used, but that he had a feeling Simonelli would use it to try to obtain some property. Cross-examination at trial showed that Baker had been untruthful during this proffer.

Baker received an immunity order. He also testified at trial that he lied in the second grand jury appearance when he said that only in retrospect did he realize something was illegal when in fact he knew it was illegal at the time. He testified that he lied because at the time he was afraid, but that he had come to understand that he had no reason to lie and so did not lie in his testimony on direct at trial.

On redirect the government responded with evidence, admitted over some objections, that Baker had made a number of statements to the grand jury which were consistent with his trial testimony. Baker was then permitted to read testimony he had given to the grand jury and to say that it was consistent with his trial testimony. Some of that evidence went beyond the specific points covered on cross-examination about the grand jury testimony, but generally was within the scope of the overall cross-examination. The trial judge did not permit the grand jury transcript to be introduced and later instructed the jury that it could consider the inconsistencies only as they related to the topic of whether a witness was to be believed.

Here, the witness was doubly impeached: he was impeached by the disparity between certain trial and grand jury testimony and impeached by his admission that he lied before the grand jury and to the prosecutors. The defense showed that Baker lied to the prosecutor when he was under an explicit obligation to tell the truth and that Baker lied to the grand jury, even though it was not in his interest to do so because he had been given immunity. This suggested that at trial, where Baker also testified under immunity, he might still be lying. The purpose of some of the rehabilitation by prior consistent statements was not to show there was really no inconsistency but to show that Baker did not lie about everything and that most of what else he had to say at trial was consistent with what he had said earlier to the grand jury.

The issue of when prior consistent statements can be used to rehabilitate a witness, rather than as substantive evidence, has its complications. Before the Supreme Court decision in *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), most but not all circuits had held that although prior consistent statements could not be used for the truth of the statement if the conditions in Rule 801(d) were not met, the Rule did not displace the common law rule that prior consistent statements could be introduced in certain situations to rehabilitate a witness. Usually, this situation occurred when the other consistent statements came from the same document or transcript and pertained to the same supposedly inconsistent statement. The policies behind Rule 106, the rule of completeness, were used, in part, to justify admissibility. *See, e.g., United States v. Millan,* 230 F.3d 431, 434 (1st Cir.2000) (rule of completeness permits party to introduce rest of fragmentary statement used against it in order to place excerpt in context). This court had

early on said that "out-of-court statements are often admissible for non-hearsay purposes and ... a district court has considerable leeway in applying Rule 403." *United States v. Mazza,* 792 F.2d 1210, 1215 (1st Cir.1986), *cert denied* 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987).

In *Tome,* the Court addressed a different issue: whether "out-of-court consistent statements made *after* the alleged fabrication, or *after* the alleged improper influence or motive arose are admissible under the Rule." 513 U.S. at 152, 115 S.Ct. 696 (emphasis added). Noting that the text of Rule 801 provides that statements meeting the Rule's requirements are not hearsay and thus may be used substantively, the Court held that the Rule embodies the common law requirement that the statement must have been made before there was a motive to fabricate. In *Tome,* it appears that the government was attempting, after hesitant and uncertain testimony by a child of sexual abuse and a cross of the child to the effect that she had a reason to fabricate, to prove its substantive case through a parade of other witnesses who would testify that the child had told them earlier about the abuse. *Tome* does not govern here for two reasons: the statements here were not offered for their truth and the question of post-motive to fabricate "consistent statements" is simply not presented here.

Since *Tome,* this court has adverted to but not decided the issue of whether prior consistent statements may be admissible, when the conditions of Rule 801 are not met, if they are not offered for their truth but only as to credibility following impeachment through prior inconsistent statements. *See United States v. Lozada–Rivera,* 177 F.3d 98, 103 (1st Cir.1999) ("It is a matter of some debate whether Rule 801(d)(1)(B) controls prior consistent statements of all stripes or whether a more relaxed test applies when a prior statement is offered for a rehabilitative purpose."). One reason for caution is that the line between substantive use of prior state-

ments and their use to buttress credibility on rehabilitation is one which lawyers and judges draw but which may well be meaningless to jurors. *See Tome,* 513 U.S. at 171, 115 S.Ct. 696 (Breyer, J., dissenting).

■ With this context, we come back to our problem. We now join the majority view, well expressed by the Fourth Circuit in *United States v. Ellis,* 121 F.3d 908 (4th Cir.1997), *cert. denied,* 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 674 (1998), that "where prior consistent statements are not offered for their truth but for the limited purpose of rehabilitation, ... Rule 801(d)(1)(B) and its concomitant restrictions do not apply." *Id.* at 919. When the prior statements are offered for credibility, the question is not governed by Rule 801.

■ That Rule 801 does not preclude admissibility does not establish that there is a basis for admissibility. Whether there is a basis for admissibility is determined by the interplay between the rule of completeness and the common law doctrine about prior consistent statements. Both evidentiary doctrines serve a common interest: prior statements are admissible which tend to show the statement is not really inconsistent when it is understood in its proper context. *See* 4 *Wigmore on Evidence* § 1126, at 259–62 (Chadborn rev. 1972) (criticizing broader rules of admissibility of prior consistent statements and commending narrower rule which allows evidence of prior statements to help jury determine if there really was a contradiction). This is also the approach taken by the Fifth Circuit in *United States v. Holland,* 526 F.2d 284 (5th Cir.1976), allowing the government to use a statement made in "the same [grand jury] proceeding to correct an earlier misstatement" in the grand jury testimony which had been used to impeach the witness. *Id.* at 285. Prior consistent statements still must meet at least the standard of having "some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." *United States v. Pierre,* 781 F.2d

329, 331 (2d Cir.1986). Other circuits have also recognized admissibility when the prior statements serve to clarify whether the impeaching statements really were inconsistent. *See, e.g., United States v. Harris,* 761 F.2d 394, 400 (7th Cir.1985). That purpose is more in accord with the rule of completeness, and statements for that purpose are admissible. *See Tome,* 513 U.S. at 172–73, 115 S.Ct. 696 (Breyer, J., dissenting).

Here neither the rule of completeness nor the common law doctrine of admissibility of prior consistent statements justified the admission of all of the evidence. We reject the government's argument that all of its use of prior consistent grand jury testimony is encompassed by the rule of completeness. This court rejected the same broad argument from the government in *United States v. Awon,* 135 F.3d 96 (1st Cir.1998), decided before the trial in this case.[6] We held the rule of completeness applied only where the introduction of limited pieces of information created unfairness or potential for misimpression. *See id.* at 101. In *Awon,* we held:

> The doctrine of completeness does not permit the admission of otherwise inadmissible evidence simply because one party has referred to a portion of such evidence, or because a few inconsistencies between out-of-court and in-court statements are revealed through cross-examination; rather, it operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction of the full text of the out-of-court statement.

*Id.*

We do not suggest that the rule of completeness has no bearing here, only that it does not apply to all of the evidence at issue. In fact, there was some evidence which was admissible under the rule of completeness. For example, Baker testified that when he was presented with the larger context of his seemingly inconsistent statement to the grand jury about the tax returns given to Merrill Lynch, he fully admitted to the grand jury that he was part of the fraud as to the Merrill Lynch returns. But it is also true that the government's use of grand jury testimony went beyond the specific inconsistencies in the grand jury testimony addressed on cross. It said it could do so because there has been a general attack on Baker's credibility.

■ We see little basis for admissibility of the questioning about Baker's grand jury testimony that went beyond the setting of context, explanation, and completeness for the answers he gave on cross about his inconsistent answers to the grand jury. There is no rule admitting all prior consistent statements simply to bolster the credibility of a witness who has been impeached by particulars. *See Tome,* 513 U.S. at 157, 115 S.Ct. 696 ("Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited."). There was certainly some discretion in the trial judge, as the boundaries for what is needed for completeness may be unclear. But beyond that, the introduction of prior grand jury statements on redirect was not really for rehabilitation. The government was just presenting again the testimony it presented on direct, this time through the testimony about statements to the grand jury.

---

6. In *Awon* two government witnesses on cross-examination testified that each first made statements implicating defendant after the witness himself had been targeted by the police and then agreed to cooperate. Thus, cross-examination established a motive to fabricate. The government sought to rehabilitate the witnesses by introducing earlier statements made to police. Those statements were admitted and then the defense highlighted the inconsistencies between the trial testimony and those statements. The government argued on appeal that the rest of the statements were admissible under the doctrine of completeness because the written statements bolstered the in-court testimony.

■ For much the same reason, though, the error in admitting some prior statements, standing alone, is harmless. The evidence was cumulative and the line between what was useful for completeness and what went beyond is a judgment call. At most the evidence was an extra helping of what the jury had heard before. Sometimes, of course, that extra helping can be so prejudicial as to warrant a new trial. Not here. There was strong evidence of guilt and some improper repetition of testimony through what a witness said to a grand jury, in a generalized effort to bolster the witness, mattered little.

### 2. Jury Instruction

■ Simonelli says that the district court erred in not giving his proposed accomplice instruction to the jury. Baker was the accomplice.

Here the district court gave the jury an instruction on immunized witnesses:

> You've heard the testimony of Gary Baker and Jeff Crabtree, each of whom has testified under a grant of immunity issued by a court. What this means is that the testimony of those individuals may not be used against them in any subsequent criminal proceeding. However, if either of them testified untruthfully, that individual could be prosecuted for perjury or making a false statement, even though he was testifying under a grant of immunity.
>
> Some people in this position are entirely truthful when testifying. Still, the testimony of a witness who provides evidence against a defendant for immunity from prosecution must always be scrutinized and weighed with particular caution and care. That witness may have had a reason to make up stories or exaggerate what others did because he wanted to help himself. You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice against the defendant, or by any of the benefits he has received from

the government as a result of being immunized from prosecution.

The court rejected the defense request for an accomplice instruction on the ground that it duplicated the immunized witness instruction.

In *United States v. Newton*, 891 F.2d 944 (1st Cir.1989), this court held that there was no error in not giving a specific accomplice instruction where an immunized witness instruction was given because the two were functionally equivalent: "In both instances, the jury is instructed that the testimony must be received with caution and weighed with care. Consequently, whether we treat the government witnesses as accomplices or as persons granted immunity, or both, is immaterial, because the instruction would be the same." *Id.* at 950.

Simonelli tries to distinguish *Newton* on the grounds that the immunized witness instruction also conveys that the witnesses have particular incentive to be truthful and so that instruction does not adequately capture the concept that accomplices have incentives not to be truthful. That is true. But the instruction given was an accurate reflection of the evidence at trial, where the accomplices were immunized. The district court was correct to decline to give an additional accomplice instruction.

### 3. Harmless error

■ The errors we are left with are the one question and answer about violation of the Pratt & Whitney anti-gratuity policy and excessive use of prior consistent statements from grand jury testimony. These are non-constitutional errors and analyzed under the harmless error test. *See United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

We find the errors, cumulatively, are harmless for a number of reasons. The case was not, as Simonelli describes it, entirely a contest for the jury to pick whom it believed: Simonelli or the accoun-

tant Baker. Independent of Baker's testimony, there was strong evidence that Simonelli had committed tax fraud. There were the expenditures of considerable sums of money for his personal benefit: homes, country clubs, cars and other accoutrements of wealth, with little of the sums to pay for these things reported to tax authorities as his income or as a loan to him. Further, to the extent such items were expensed on the corporate returns, a jury could easily conclude that these were not legitimate business expenses for the company but were really income to Simonelli. Then there was the contrast: when it was in Simonelli's interest to report higher income in order to obtain financing from Merrill Lynch and from Mercedes–Benz Credit Corporation, he provided information on loan applications and what purported to be his tax returns showing his income to be in the hundreds of thousands of dollars. This contrasted with the paltry income he reported to the IRS. From the fact that Simonelli was willing to mislead those two companies by purporting to show them "his" tax returns, but not the returns he actually filed with the IRS, the jury could conclude he was willing to mislead the IRS as well. From the fact that Simonelli took some steps, primitive though they were, to hide his use of corporate monies, such as the payments of his obligations to his parents, the jury could infer an intent to commit fraud. Further, Debbie Graves, who worked as a bookkeeper at the company, testified that Simonelli maintained close scrutiny over his business and was not always forthcoming as to the purpose for specific checks, once barking at her to "[n]ever mind what the damn check is for. Just write it out when I tell you to." From that testimony, the jury could reject Simonelli's defense that he was an innocent in the hands of a corrupt accountant and, indeed, believe the falsity of his explanation was further evidence of his guilt. The sheer amount of unreported income involved—more than $1 million for 1991 and $600,000 for 1992— also made his defense less than credible.

Baker's testimony was also strong: in addition to the particulars of any number of events, he said that he warned Simonelli that some transactions amounted to tax fraud and that Simonelli told him to do them anyway. Baker testified that Simonelli repeatedly instructed him that he did not want to pay taxes and that the best place to "hide the money" was in the firm's material expense category and so, for example, payments for a Vermont chalet for Simonelli were there hidden. Baker had little incentive to perpetrate a massive tax fraud in the name of an unsuspecting client. He received no benefit from the fraud other than his normal accounting fee.

There is no rational basis to conclude that the errors would have had any effect on the jury verdict at all. We affirm the conviction.

### 4. *Sentencing Issues*

Simonelli claims there were several errors in sentencing. First, the amount of the tax liability, $457,000, he says is wrong and was a dramatic increase from the $349,027 figure the Probation Department originally calculated, and that Probation only corrected the figure a few days before sentencing, and so notice of the increased sum was inadequate. Simonelli says that the later, larger figure improperly includes sums attributable to the defendant's brother. Second, he argues that the jury was required to decide the amount of tax liability under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The final claimed error is that the court erred in imposing a fine of $500,000 without adequately explaining its decision.

 These arguments are without merit. There is no *Apprendi* issue because, at the least, his sentence was within the statutory maximum of five years under 18 U.S.C. § 371 and three years per offense for his 26 U.S.C. § 7206(1) and § 7206(2) violations. As for the inadequate notice argument, it was not raised in

the trial court and defendant knew of the higher figure days before the sentencing hearing. The higher figure was a correction of a mistake and the rules do not prevent corrections of mistakes. Simonelli has shown no prejudice. Whether the brother's ownership interest was a straw for Simonelli or genuine, it was related relevant conduct and could be counted. *See* U.S.S.G. § 1B1.3.

Finally, the guidelines provide for an upward departure in the amount of a fine on conditions and for reasons stated in U.S.S.G. § 5E1.2(c), app. note 4. The district court expressly based its upward departure on that guideline, thus adequately explaining the reason for the increase.

The conviction and sentence are *affirmed.*