UNITED STATES of America, Appellee,

v.

David CUDLITZ, Defendant, Appellant.

No. 95–1099.

United States Court of Appeals,
First Circuit.

Heard Aug. 4, 1995.

Decided Jan. 8, 1996.

**994**

Kimberly Homan with whom Sheketoff & Homan was on brief, Boston, MA, for appellant.

Robert E. Richardson, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, Boston, MA, for the United States.

Before SELYA and BOUDIN, Circuit Judges, and LISI,* District Judge.

BOUDIN, Circuit Judge.

David Cudlitz was indicted in July 1993 and charged in four counts, respectively, with conspiracy to commit arson, 18 U.S.C. § 371, arson, id § 844(i), mail fraud, *id.* § 1341, and use of fire to commit a felony, *id.* § 844(h). In substance, the government alleged that in 1992 Cudlitz, in order to obtain the insurance proceeds, arranged to have set on fire an unprofitable apartment building he owned at 7 Salisbury Street in New Bedford, Massachusetts. Cudlitz was tried by a jury in March 1994.

At trial, the government offered the testimony of three individuals—Craig Santos, Harold Burnham, and Daniel Cornell—who in the summer and early fall of 1992 were living as tenants at another apartment building owned by Cudlitz in New Bedford located at 89 Austin Street. These three, and Cornell's brother David Vieira, who also testified, did odd jobs for Cudlitz in the various buildings he owned. All except Burnham had criminal records, and Burnham drank a good deal.

Cornell testified that in late August or early September 1992, Cudlitz twice asked Cornell to set 7 Salisbury Street on fire, but he (Cornell) refused. Vieira testified that in early September Cudlitz made similar requests of him and, when he refused, asked whether Santos and Burnham would do it and later said he was going to ask them to do the job. Vieira also testified that he vandalized one of the apartments at Cudlitz' request prior to the fire. Santos and Burnham both testified that Cudlitz had requested them to set the fire and that they had agreed to do so for $1,500 (according to Santos) or $1,000 (according to Burnham).

---

* Of the District of Rhode Island, sitting by designation.

Santos and Burnham testified that they did set the fire at 7 Salisbury Street on the evening of September 18, 1992, starting it with gasoline spread in the attic and down the back stairs. The fire department put out the fire in the attic, confining the damage; the fire captain testified to smelling the odor of a flammable liquid. There was also testimony that the following day Cudlitz complained to Burnham and Santos that they had not done a good job, and that he then set Vieira to vandalizing the third floor of 7 Salisbury Street to increase the damage.

Eventually, Cudlitz collected on insurance claims for both the fire and the vandalism. Thereafter, Santos and Burnham moved into 7 Salisbury Street but were eventually evicted by Cudlitz when Santos stole some property from the basement. Later Santos, interviewed in connection with the fire, admitted his role. He and Burnham were both indicted with Cudlitz, although only on the conspiracy and arson counts, and both pled guilty in exchange for possible leniency for cooperating with the government.

Cudlitz testified in his own defense. He flatly denied that he had ever solicited either the arson or the vandalism at 7 Salisbury Street; he claimed a net worth of over $1 million, although he admitted on cross-examination that 7 Salisbury Street was not currently profitable because largely vacant; and he gave testimony, described at greater length below, indicating that he had not previously staged an arson or ever before filed an insurance claim for fire damage on any property he owned.

The jury convicted Cudlitz on all four counts. In December 1994, Cudlitz was sentenced to 36 months in prison on the first three counts, and a mandatory consecutive term of 60 months on the final count. He now appeals, conceding the sufficiency of the evidence but raising several other claims of error. Three of them, all complicated, relate to questions allowed on cross-examination of Cudlitz; the others concern the trial court's instructions.

## I.

Cudlitz asserts first that the district court erred by allowing the prosecutor to cross-examine him about an alleged prior attempt to solicit arson. The critical set of questions, which the court permitted the prosecutor to ask in three different versions and over Cudlitz' objection, was whether Cudlitz had in 1991 solicited one Ron Wallace—another tenant who was then doing odd jobs for Cudlitz—to burn down another one of Cudlitz' buildings. Cudlitz denied doing so and, apart from some follow-up cross-examination described below, the government made no attempt to prove the solicitation.

The rules governing this subject—cross-examining a criminal defendant about prior wrongs—are among the most complex and confusing in the entire law of evidence. The main reason is that they represent not a logical pattern but a series of ad hoc accommodations arrived at by the common law over the course of centuries in dealing (differently) with several related problems. Worse still, the Federal Rules of Evidence have retained the common law structure, with a few modifications, but expressed it in four different rules—Fed.R.Evid. 404, 405, 608 and 609—whose relationship and content are not models of clarity.

Cudlitz' main complaint is that there was no "basis" for allowing the questions in dispute, but two different bases support the questions. Ordinarily, the government cannot elicit evidence of prior similar bad acts to show that the defendant has a propensity to commit such acts and is thus more likely to have committed the crime now charged. Rule 404(a). But this rule against so-called "character evidence" by the prosecutor is waived where the defendant chooses to offer "good" character evidence in his own defense. Rule 404(a)(2).

Cudlitz did offer such evidence here by testifying on direct examination that, when previously faced with an unprofitable business venture, he had dutifully paid his debts and had not had any fire connected with that enterprise, nor made a claim for insurance for fire damage on any other of his properties. In effect, Cudlitz was offering evidence of good character by showing, quite pertinently, that he lacked the propensity to commit arson and insurance fraud in inviting

circumstances. Under Rule 404(a)(2), the government was therefore entitled "to rebut the same" by seeking to elicit evidence of bad character.

Cudlitz' good character evidence was improper in form since the rules limit the proponent to offering an opinion or reputation witness rather than testifying to specific instances or events, as Cudlitz did in denying any past occurrence. Rule 405(a). But the detail simply made Cudlitz' testimony more effective for him. The government's attempt to rebut by asking Cudlitz about a specific prior arson attempt was within the rules; for "[o]n cross examination, inquiry is allowable into relevant specific instances of conduct." Rule 405. *E.g., United States v. West,* 58 F.3d 133, 141 (5th Cir.1995).

■ Alternatively, the question as to the prior arson can be justified on a theory of impeachment by contradiction. Before asking about the specific attempt to solicit Ron Wallace to commit arson in 1991, the prosecutor asked without objection whether Cudlitz had ever solicited anyone to commit arson, and Cudlitz said that he had not. When a witness testifies to a fact, he may—subject to certain limitations—be cross-examined to elicit testimony contradicting his prior testimony for the purpose of showing that the witness is a liar and should not be believed. *United States v. Havens,* 446 U.S. 620, 627, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980); *United States v. Perez–Perez,* 72 F.3d 224, 227 (1st Cir.1995).[1]

The government and the district court thought that this theory of impeachment is reflected in Rule 608(b), an assumption that is shared by some courts. But Rule 608 is centrally concerned with character for veracity, a mode of accrediting or discrediting the witness that is based on the same "propensity" reasoning of Rule 404 but is subject to quite different rules. Rule 608 permits accrediting or discrediting by opinion or reputation evidence as to character for veracity, Rule 608(a), and, on cross-examination only, by inquiry into specific instances of conduct *if* "probative of truthfulness or untruthfulness." Rule 608(b).

■ At common law, the quoted restriction was not always included, but Rule 608 deliberately narrowed type of conduct allowed. Thus, Cudlitz might have been cross-examined under Rule 608(b) as to prior instances of forgery or perjury; but soliciting arson, although showing bad character generally, is not "probative of . . . untruthfulness."[2] But neither does Rule 608(b) prohibit the questions so long as they were justified on *another* basis. Here, impeachment by contradiction was such a legitimate basis. *Perez–Perez,* slip op. at 6–7, 72 F.3d at 227.

Cudlitz objects that the government was seeking to contradict a denial (of prior solicitations) that it had itself improperly elicited, a practice that we warned against in *United States v. Ruiz–Batista,* 956 F.2d 351, 352 n. 1 (1st Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992). It is true that the government's question on cross went marginally beyond the scope of the direct. But we think that the denial of prior solicitations was very strongly implied by Cudlitz' direct testimony, denying that he had set fires on any other occasion. The government may have sharpened the edge slightly but Cudlitz himself proffered the weapon. *United States v. Eaton,* 808 F.2d 72, 75–76 (D.C.Cir.1987).

■ Cudlitz asserts that the questions should have been barred under Fed.R.Evid. 403 because the risk of unfair prejudice greatly outweighed probative value. The risk of prejudice was certainly real but, given Cudlitz' own attempt to portray himself as a businessman of upright character who had

---

**1.** There is no Federal Rule of Evidence labeled "impeachment by contradiction" but the critical point to remember about those rules is that they treat *selected* topics and even then sometimes only selectively. Several of the most familiar modes of impeachment (*e.g.,* bias, prejudice, interest, corruption) are never mentioned.

**2.** The government's response, which is not without some force, is that arson may not impugn veracity; but that arson in aid of insurance fraud would do so and that such fraud was implicit where the building was owned by the arsonist. *Compare United States v. Wilson,* 985 F.2d 348, 351–52 (7th Cir.1993). We need not resolve the issue here.

never resorted to arson or insurance fraud, allowing the questions was not an abuse of the broad discretion enjoyed by the district judge. *United States v. Mateos–Sanchez,* 864 F.2d 232, 235–36 (1st Cir.1988). Nor do we agree with Cudlitz that the evidence sought to be elicited was in any way made superfluous by the direct testimony against him.

Finally, Cudlitz appears to attack the prior-solicitation question at its foundation. As he suggests, the government surely knew that Cudlitz would deny the prior arson solicitation; nor could it offer extrinsic evidence to prove the solicitation if Cudlitz denied it. *United States v. Innamorati,* 996 F.2d 456, 479 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1073, 127 L.Ed.2d 391 (1994). An observer might well join Cudlitz' appeal brief in asking how it could possibly be proper for the government to ask a prejudicial question that it knows will be answered negatively, that cannot be pursued with extrinsic proof, and that serves only to suggest to the jury (contrary to the standard instruction) the fact implied by the question.

The only answer is that the cross-examination of this kind is part a system of checks and balances that the law has developed to caution a credulous jury against possible perjury. Thus, while the question may be asked, the government must on demand supply a good faith basis for the question; the witness may vigorously deny the suggestion and explain the basis for the denial; with rare exceptions, the government must accept the answer without offering extrinsic evidence; and the court will normally provide a limiting instruction. With these protections, and Rule 403, the defendant must be content. As Justice Jackson said in *Michelson v. United States,* 335 U.S. 469, 486, 69 S.Ct. 213, 223, 93 L.Ed. 168 (1948):

> [M]uch of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counter-privilege to the other. But somehow it has proved a workable even if clumsy system when moderated by discretionary controls in the hands of a wise and strong trial court. To pull one misshapen stone out of

the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice.

## II.

The most troublesome issue in the case arises out of a related but distinct series of questions asked of Cudlitz on cross-examination. The questions began as the prosecutor laid the groundwork for asking Cudlitz whether he had earlier solicited Wallace to set fire to 212 State Street. He first asked Cudlitz whether one Joe Camara had introduced Wallace to Cudlitz at 212 State Street and Cudlitz responded: "Ron Wallace lived in the house. He lived in—he lived—yes, he did."

The prosecutor then asked, "So you knew Ron Wallace, correct?" and Cudlitz replied, "No, I didn't know him really." There followed some questions aiming to show that Wallace had done work at the building for Cudlitz; Cudlitz said that he thought Wallace was helping Joe Camara clean out the yard at 212 State Street, a task for which Cudlitz was paying Camara. The prosecutor then asked—over objection—"Had you ever heard as of that time [summer 1991] that Mr. Wallace had been arrested on charges of arson?"

Cudlitz said "no" and the prosecutor then followed with three questions, earlier mentioned, which in substance asked Cudlitz whether he had twice solicited Wallace to set fire to 212 State Street, whether one of these requests had been made in Camara's apartment, and whether Cudlitz had offered Wallace $2,500 to do the job. When Cudlitz answered "no" to each accusation, the prosecutor proceeded as follows:

Q Do you know where Ron Wallace it [sic] today, sir?

  MR. LEE: Objection, please, your Honor.

  THE COURT: Overruled.

A No, I don't.

Q Have you ever heard that Ron Wallace is down in Plymouth County—

  MR. LEE: Objection, your Honor.

  THE COURT: Overruled.

Q   In the Plymouth House of Corrections?

A   No, I didn't know that.

Q   Did you ever hear that Mr. Wallace had pled guilty to a charge of arson and conspiracy to commit arson?

MR. LEE:  Objection, please, your Honor.

THE COURT:  Overruled.

A   No, I haven't.

Q   At no time have you ever heard that?

A   No.

On this appeal, Cudlitz says that the cross-examination as to Wallace's whereabouts and prior arson conviction was error.  The government says it was not.  It argues further that at trial Cudlitz made no *specific* objection to the questions—that is, that the objections did not state their precise legal basis— so that the highly forgiving standard of plain error governs.  Finally the government says that if error occurred it was harmless, given the cumulative weight of the evidence against Cudlitz.  We address these three issues in the same order.

■   Resolving the first issue, we conclude that this branch of the cross-examination should not have been allowed.  The questions on their face suggested that, at the time of Cudlitz' trial in 1994, Wallace was then serving a jail sentence for arson and conspiracy to commit arson.  This suggestion in turn lent credence to the far more damaging suggestion that in 1991 Cudlitz had solicited Wallace to burn down 212 State Street.  Some jurors could have believed that Wallace's current jail sentence was for the 1991 arson effort allegedly involving Cudlitz; others, that at least Wallace was an arsonist and so more likely than otherwise to be plotting arsons with Cudlitz.

None of this might matter if the questioning about Wallace's whereabouts and arson conviction had been proper.  But even with time to reflect, the government offers very little basis for the questions.  Its main argument is that Cudlitz, in the lead-up to the disputed questions, was seeking "to distance himself from Wallace."  Therefore, says the government, "it was appropriate to find out whether the defendant at least knew Wallace well enough to know his background," *i.e.,*

that he was charged and later imprisoned for arson.

In fact, Cudlitz admitted at the outset that he knew Wallace, that Wallace lived in his building and that Wallace was helping Camara on a task that Camara was performing for Cudlitz.  True, Cudlitz implied that he did not know Wallace well; but the questions about knowledge of Wallace's arson and jailing would not have proved a close acquaintanceship.  Far more important, the arguable but very slight relevance of the questions can hardly be compared to the substantial prejudice they were capable of inflicting, so they certainly could not have passed the test of Rule 403 on this excuse.

The government also says that "had the defendant admitted to knowing Wallace well enough to know that he ended up in custody after pleading guilty to arson charges, that would have helped to explain why the defendant turned to people such as Cornell, Vieira, Santos, and Burnham when he decided to have the Salisbury Street property burned."  There are various problems with this explanation but one is sufficient.  Cudlitz was asked whether he knew in 1991 of Wallace's arrest and his incarceration as of 1994; but there was no indication whether Wallace was in jail in 1992 when the fire at Salisbury Street occurred, and that is the only date relevant to the choice of accomplices.

■   Defense counsel objected to virtually all of the questions at issue as to Wallace's location and prior crimes but gave no reason.  The government argues that the questions are therefore to be reviewed only under the plain error doctrine.  Fed.R.Evid. 103(a)(1) does require that the specific ground be stated, "if the specific ground was not apparent from the context."  Here, we think that the central objections—arguable irrelevance and certainly undue prejudice—were obvious.  Indeed, Cudlitz' counsel had begun the morning by making those objections to the more defensible question about Cudlitz' alleged solicitation of Wallace to commit arson.

■   Accordingly, we think that the questions at issue are fairly tested under the harmless error doctrine, and not by the more

demanding requirements of plain error. Under the harmless error doctrine, *cf. Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), we are instructed to ask whether it is "highly probable" that the error did not "contribute to the verdict." *E.g., United States v. Rullan–Rivera*, 60 F.3d 16, 18–19 (1st Cir.1995). The greater the likely impact of the error, the harder it is to find harmless error; conversely, the greater the weight of the other evidence against the defendant, the less likely it is that a given error swayed the jury.[3]

■ Thus to frame the issue only compounds our dilemma. The evidence against Cudlitz was substantial: four witnesses said that Cudlitz had solicited them to set the fire; and two of them, Santos and Burnham, said they had done so, and been paid by Cudlitz. The same witnesses, and the girlfriend of one of them, testified to incriminating statements made by Cudlitz after the fire, and the government offered evidence of financial motive. Further, at the time they admittedly set the fire, Santos and Burnham were on good terms with Cudlitz; any hint of blackmail arose only later.

But the only four real witnesses against Cudlitz were linked together; each had a criminal record except Burnham, who drank to excess; and by the time of trial Santos and Burnham had multiple reasons for hostility. Cudlitz took the stand, flatly denied the allegations, and testified to his own record as an honest businessman with a comfortable financial base. There was *no* hard evidence that directly inculpated Cudlitz. The case was in essence a credibility contest between Cudlitz and four quite dubious witnesses, who told generally consistent stories but with some discrepancies.

Under these circumstances, it would have been easy—if not strictly fair—for the jury to have given great weight to the suggestion that Cudlitz had previously sought to have Wallace burn down a different building he owned. Of course, the jury was told that the lawyer's questions are not evidence, although not contemporaneously. But the sting survives such instructions, which is why lawyers ask impeaching questions that they know will produce denials. That is just why the government in this case asked Cudlitz whether in 1991 he had asked Wallace to burn down 212 State Street.

If *that* line of questions had been error, we would easily say that it was not harmless. The jury could well have had trouble deciding who to believe about the 1992 fire for which Cudlitz was on trial, but found those doubts resolved when it learned, or thought it had learned, that Cudlitz had been involved in a 1991 attempt to burn down another building by employing another tenant as henchman. Yet as the questions that carried that implication were not error, we are left to ask what was *added* to that implication by the related questions at issue concerning Wallace's arson conviction and jailing.

The answer is impossible to quantify, but we think that the additional effect may well have been more than trivial. The case being a credibility contest, the suggestion that Cudlitz had previously engaged in the same conduct was quite dangerous to Cudlitz, especially given his prior claim to a blameless past. But the suggestion was flatly denied, the government had to accept the answer, and the jury was to be told in due course that the statements of lawyers were not evidence. Quite possibly, despite the detail in the questions about the prior solicitation, the jury would in doubt have put the suggestion aside.

The doubt could well have been removed by the further suggestion that Wallace had actually been convicted for conspiracy and arson and was now in jail for those crimes. Cudlitz did not deny these further facts, but only his knowledge of them; and the jury could fairly suppose that the prosecutor would not make statements as to Wallace's conviction and jailing without actual knowledge. By any of several inferences—we have already given two examples—the jury could have thought that these new facts made it substantially more likely that Cudlitz

---

3. This gloss is hardly a precise standard but *Kotteakos*, while repeatedly reaffirmed as the governing standard for claims for non-constitu-tional error, *e.g., United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), has rarely been elucidated by the Supreme Court.

had solicited Wallace to commit an earlier arson.

No one knows what reasoning the jury actually used in convicting Cudlitz, nor have we any doubt that a reasonable jury could have convicted Cudlitz on this record even if Wallace's name had never been mentioned. But the jury, which deliberated for two days, apparently did not view the matter as open and shut. And under the harmless error doctrine, we can uphold the conviction, in the teeth of an error preserved by a timely objection, only where we think it "highly probable" that the error played no role in the conviction, that is to say, that the result would have been identical regardless of the error. *Rullan–Rivera*, 60 F.3d at 18–19. Given the potential impact of the error, and the questions that the jury could legitimately have about the government's proof, we cannot with confidence so conclude in this case.

It is a shame that a lengthy trial should now have to be repeated because of questions totaling less than a page of transcript, all of which resulted in exculpatory denials. But impeachment by questions about prior crimes can be devastating, and when the prosecutor embarks on their use, he or she has to take special care to keep the questions and devastation within bounds. Doubtless the temptation to press an advantage is harder to resist where, as here, credibility is the key to the case and "hard" evidence of guilt is absent. But that is just why the harmless error argument has failed in this instance.

### III.

We address here, and in part IV, several additional claims that—although not determinative of this appeal—could affect the retrial. Cudlitz next complains about the cross-examination of defense witness Albert Raposo, a construction contractor, who testified on direct that he had provided Cudlitz with an estimate of the fire and vandalism damage at the Salisbury Street building. On cross-examination, the prosecutor began to question Raposo about whether he had offered Cudlitz advice on how best to create the appearance of vandalism in order to collect insurance proceeds. Defense counsel objected that no good faith basis existed for this inquiry, but after a bench conference and proffer from the prosecutor the judge allowed the questions without further defense objection.

The relevant portion of the cross-examination was as follows:

Q: Did you ever give Mr. Cudlitz advice on how to cause damage to 7 Salisbury Street?

A: No, sir.

Q: Did you ever give Mr. Cudlitz advice on how to best try to make—create the appearance that vandalism had been done?

MR. LEE: Objection your honor. May we approach the bench?

THE COURT: Yes.

[BENCH CONFERENCE OMITTED]

Q: Mr. Raposo, did you ever give the defendant advice on how to cause damage in 7 Salisbury Street to make it appear that vandalism had been done there?

A: No, sir.

Q: Did you ever tell the defendant in words or substance that it wasn't enough just to rip up rugs, because that might just look like something a tenant had done in leaving the building?

A: No, sir.

Q: Did you ever tell the defendant in words or substance that to collect money from the insurance company you had to do things like break plumbing fixtures?

A: No, sir.

On appeal, Cudlitz again asserts lack of a good-faith basis and, in addition, contends that no proper purpose existed for allowing this line of questions. Because the defense did not renew its good-faith objection after the prosecutor's proffer and the trial court's ruling, and because no other objections were raised at trial, the government urges that we limit review to plain error. Since the lack of a good faith basis was the only ground offered by Cudlitz for excluding the questions, we agree that this is the standard for judging any other objection to the testimony.

■ Here, the government offers two different grounds for permitting the questions, assuming a good faith basis. One is that Cudlitz' alleged procurement of vandalism at 7 Salisbury Street was an issue in this case. Vieira testified that he was solicited to vandalize one apartment prior to the fire and another one afterwards when the fire damage proved inadequate, and the government's case treated the arson and vandalism as part of the same effort to defraud the insurance company. The questions to Raposo were pertinent to this showing, although arguably they were well outside the scope of the direct (an objection not made by Cudlitz).

Additionally, the government argues that these questions were permissible under Rule 608(b) to impeach Raposo himself by showing that he had participated in insurance fraud. Here, the alleged advice was given by Raposo for the very purpose of perpetuating such fraud, and thus was allowable in the trial judge's discretion. *See .Wilson*, 985 F.2d at 351–52. It is not clear to us that Raposo had given direct evidence that the government needed to impeach, but Cudlitz did not offer such an objection, which would have been pertinent to the trial court's exercise of discretion under both Rule 403 and Rule 608(b).

In sum, reserving the question of a good faith basis, we think that the district court did not commit plain error by allowing the cross-examination. Here, Cudlitz did not make a general objection but a specific one— lack of good faith—and the district court had no reason to think that other possible lines of objection were being urged by Cudlitz as obvious from context. Given that none of the other possible objections is clearly meritorious but only arguable, we see no basis for thinking that any plain error, or manifest injustice, occurred. *United States v. Olano*, 507 U.S. 725, 732–37, 113 S.Ct. 1770, 1777– 779, 123 L.Ed.2d 508 (1993).

Turning to the question of good faith basis, the issue is somewhat closer both as to the standard and the result. Cudlitz' counsel clearly objected that there was no "good faith basis for these questions," adding that counsel was not aware of an connection between Raposo and any prior government witness. The government then explained its basis— that Vieira had told the government that an associate of Cudlitz named "Al" had been present with Vieira and had been giving advice on how to vandalize—Cudlitz' counsel did not argue further the lack of a good faith basis but switched to complaining that no such statement had been given to the defense.

Both the "merits" and the standard to apply are thus open to dispute. There is a pretty good argument that something more than a reference to "Al" was warranted before allowing the government to ask a highly damaging question; it would have been easy enough to have Vieira called to identify Raposo as "Al" outside the presence of the jury. After all, a good faith basis is a very important safeguard to assure that such highly prejudicial questions, if asked at all in the teeth of a likely denial, are not *unfairly* prejudicial.

■ On the other hand, the district judge enjoys great latitude in deciding whether a good faith basis exists. *United States v. Ovalle–Marquez*, 36 F.3d 212, 219 (1st Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995). Perhaps the result might be different if Cudlitz' counsel had protested that the proffer was inadequate, explaining the basis for his doubt and urging that at the very least Vieira should be summoned. Here, however, the trial judge got no such help and might easily have thought that Cudlitz' own counsel had been satisfied by the proffer and was no longer disputing the presence of a good faith basis.

In all events, our reversal of the convictions in this case on other grounds makes it unnecessary to decide this "what if" point definitively. On any retrial, we think that the government ought to make a somewhat stronger showing that it has reason to believe that "Al" and Raposo are the same person. We do not say that we would reverse on this ground on the present record. But the issue has now been highlighted clearly and if Raposo is "Al," then a stronger proffer should be available, a consideration that deserves some weight in determining how much of a proffer is enough.

### IV.

Cudlitz' remaining claims all relate to the absence, or alleged inadequacy, of cautionary instructions relating to the cross-examination of Cudlitz and Raposo described in the prior sections of this decision. Cudlitz claims first that a *sua sponte* cautionary instruction should have been given as to the cross-examination of Cudlitz regarding Ron Wallace; second, that the final instructions should have included a requested instruction that the "questions" of counsel are not evidence; and finally that such a specific instruction should have been given during the cross-examination of Raposo.

As Cudlitz himself concedes, the general rule is that a trial judge need not give a cautionary instruction *sua sponte* at the time that evidence of limited admissibility is offered. Fed.R.Evid. 105; *United States v. De La Cruz,* 902 F.2d 121, 124 (1st Cir.1990). Here, the issue is not one of evidence admitted for a limited purpose; it is a matter of a question not being evidence at all. But the situations are parallel, and we think that while a cautionary instruction would plainly be proper at the time that the question is asked and denied, its omission is not normally error where no such contemporaneous instruction was requested.

Cudlitz argues with some force that a standard reason why appeals courts do not insist on such an instruction *sua sponte* is the defense counsel may have made a strategic judgment not to have the matter highlighted. Here, Cudlitz says, this reason has no application because his defense counsel had objected sharply to the cross-examination as highly prejudicial and the government had already highlighted the cross-examination by asking three times over questions about Wallace's alleged solicitation by Cudlitz.

We nevertheless reject Cudlitz' broad-scale position because of the extraordinary importance we attach to the need for a timely request. No one who lacks experience with litigation can know how many things occupy a judge who is superintending a fast-paced criminal trial. Nor is it easy to know without direct experience how *sua sponte* interference from the trial judge can disrupt counsel's own strategy, even when the purpose of the judge is to help rather than to hinder. It is for these reasons that we place such great stress on the presence or absence of the request for a contemporaneous instruction.

It might well be error in some cases for the judge to fail to give a cautionary instruction at *some point,* but that is hardly the situation here. The district court told the jury at the start that the questions of counsel were not evidence; and in his final charge, the trial judge told the jury that the statements and arguments of counsel were not evidence. *United States v. Copelin,* 996 F.2d 379, 384 (D.C.Cir.1993), relied upon by Cudlitz as authority for requiring a *sua sponte* contemporaneous instruction, was overruled by *United States v. Rhodes,* 62 F.3d 1449, 1454 (D.C.Cir.1995).

In the case of Raposo's cross-examination, defense counsel did ask for a contemporaneous instruction to the jury that "the questions of counsel are not evidence." This court has said that the "better practice" is to give a cautionary instruction at the time. *United States v. Currier,* 821 F.2d 52, 56 n. 5 (1st Cir.1987). Whatever one's faith in the capacity of general instructions to offset harmful evidence, the chance that the instruction will do any good is enhanced by offering the caution while the jury has immediately before it the question or evidence it is being told to disregard or limit.

Although on retrial the district court should give such a contemporaneous instruction where requested, this omission would not standing alone cause us to reverse in this case. The district judge did give the general instruction at the outset and gave a somewhat similar, although incomplete, instruction at the close; and any damage done by the lack of such an instruction as to Raposo was dwarfed by the far more damaging questions as to the Wallace solicitation where no such contemporaneous instruction was requested or given.

Finally, on retrial we encourage the district court to tell the jury, in closing, that the "questions" of counsel, as well as their statements and arguments, are not evidence. Although an objection was properly lodged, we

are doubtful that this omission standing alone would comprise prejudicial error, especially in light of the district court's opening instruction that questions of counsel are not evidence. But given the importance of the government's cross-examination in this case, we think that the district judge should on retrial make the closing instruction as complete as possible by including a specific statement that the "questions" of counsel are not evidence.

## CONCLUSION

The judgment of conviction is *vacated* and the matter *remanded* for new trial.