UNITED STATES, Appellee,

v.

Alberto MORLA–TRINIDAD,
Defendant, Appellant.

No. 96–1070.

United States Court of Appeals,
First Circuit.

Submitted July 30, 1996.

Decided Nov. 8, 1996.

Stephen H. Mackenzie, Portland, ME, on brief, for defendant, appellant.

Jay P. McCloskey, United States Attorney, Bangor, ME, Margaret D. McGaughey, Assistant United States Attorney, and George T. Dilworth, Assistant United States Attorney, on brief, Bangor, ME, for appellee.

Before SELYA and STAHL, Circuit Judges, and TORRES,* District Judge.

STAHL, Circuit Judge.

A jury convicted defendant-appellant Alberto Morla–Trinidad of conspiring to distribute and possess with intent to distribute crack cocaine. Morla–Trinidad now seeks a new trial, claiming that the district court erred when it permitted the prosecutor to impeach his testimony with cross-examination and rebuttal evidence concerning a prior arrest of the defendant in which evidence was illegally obtained. We affirm.

## I.

### Background

On September 4, 1994, police in Lewiston, Maine, stopped a vehicle in which Morla–Trinidad was a passenger and Melvin "Bubba" Lagasse ("Bubba Lagasse") was the driver. Incident to that stop, the police officers searched Morla–Trinidad for weapons and discovered cash and small amounts of marijuana and crack cocaine. Subsequent state drug charges against Morla–Trinidad were dismissed after a Maine Superior Court judge ruled that the officers lacked justification to search him and suppressed the seized evidence.

Pursuant further investigation, federal agents arrested Morla–Trinidad in Lewiston on April 18, 1995. That same day, a grand jury returned a one-count indictment charging Morla–Trinidad and Ruth Peabody with conspiring to traffick drugs from July to December 1994 in Maine and Massachusetts.

* Of the District of Rhode Island, sitting by desig-

Peabody eventually pleaded guilty while Morla–Trinidad proceeded to trial.

## II.

### Trial Events

Because Morla–Trinidad does not challenge the sufficiency of the evidence, we describe the pertinent trial evidence in a neutral manner to provide context for the claimed error. See United States v. Procopio, 88 F.3d 21, 23–24 (1st Cir.1996). Generally, the government sought to show that, throughout the indictment period, Morla–Trinidad traveled between Lawrence, Massachusetts, and Lewiston, Maine, to manage sales of crack cocaine out of Peabody's Lewiston residence.

In its case in chief, the government presented six witnesses who testified about their involvement with Morla–Trinidad. Raul Baez testified that Morla–Trinidad initially sold drugs for him in Lawrence, but then became interested in selling in Lewiston, another locale in which Baez conducted his drug business. Baez stated that although he rejected Morla–Trinidad's offer to become a partner in his Lewiston business, he did drive Morla–Trinidad to Lewiston to meet Peabody; to Baez's dismay, Morla–Trinidad then began to compete with him in the Lewiston drug trade.

Most of the other witnesses testified that they saw Morla–Trinidad in Peabody's residence (where they bought crack cocaine), and/or that they bought the drug directly from Morla–Trinidad at that location. In particular, Marlane Driggers testified that she first met Morla–Trinidad in May 1994 in Lawrence, at which time she drove him to her apartment in Lewiston. She stated that he carried at least 200 bags of crack cocaine on that trip, intending that she sell it in Lewiston. Driggers testified that soon thereafter, she moved into Peabody's apartment out of which they sold crack cocaine. She indicated that Morla–Trinidad stayed in their living room at least three days a week and that, two or three times during each of those days, she would obtain from him a batch of twenty bags of crack cocaine to sell.

nation.

Michael Lagasse testified that his brother, Bubba Lagasse, told him that Morla–Trinidad operated out of Peabody's residence. He stated that Morla–Trinidad was at Peabody's residence at least two or three times per week and that he bought crack cocaine many times from Morla–Trinidad at that location. Three other witnesses, Bruce Moody, Scott Poulin, and Karla Schools, testified that they regularly purchased crack cocaine out of Peabody's apartment and that they either bought directly from Morla–Trinidad or they saw him there when they bought from Peabody.

There was testimony to the effect that Morla–Trinidad would exchange crack cocaine for travel between Lawrence and Lewiston. Driggers testified that she drove Morla–Trinidad from Lawrence to Lewiston at least five times and that various people, including Bubba Lagasse, Peabody and Schools, also drove him to and from Lawrence and Lewiston. Moody testified that he drove Morla–Trinidad twice to Lawrence from Maine. Schools testified that on two occasions she picked up Morla–Trinidad in Lawrence and transported him to Lewiston, where, she said, he would stay for about a week.

On the second day of his trial, Morla–Trinidad testified in his own defense.[1] Defense counsel began Morla–Trinidad's direct examination with the following question: "Alberto, yesterday there were six witnesses that testified directly about your supposed involvement in a crack ring. We'll go through this list and ask you whether you know these people in any way." In response to counsel's subsequent questions, Morla–Trinidad testified: "Of the witnesses who testified yesterday, I can assure you, I can swear before God that I have only seen two of them, [Driggers and Baez]."

As to Driggers, he testified that the first time he saw her was in prison after his April 1995 arrest. He stated that the events to which Driggers testified "didn't happen" and that he never gave or sold crack cocaine to her. As to Baez, he stated that, although he

had seen Baez several times, he neither sold crack cocaine for him nor knew that he was "involved in this kind of business." Additionally, Morla–Trinidad denied knowing either Bubba Lagasse or Peabody, his indicted co-conspirator.

Concerning his whereabouts during the indictment period (July to December 1994), Morla–Trinidad testified that he split his time between New York and Lawrence. He stated that, during this time, he was devoted full-time to his business of promoting Hispanic music in the New York area. When asked if he went to Maine during the indictment period, Morla–Trinidad replied that he traveled there only once to see his attorney. When asked if he had any friends or associates in Lewiston, he replied that he had a "woman friend" there.

During cross-examination by the prosecutor, Morla–Trinidad maintained that he did not know Bubba Lagasse and that he traveled to Lewiston only once during the indictment period—to meet only with his attorney. When pressed, however, he acknowledged that he traveled to Lewiston once again during that time, again to see his attorney, and that he also once went to a fast food restaurant near Lewiston to meet his woman friend. The prosecutor then inquired, "And on any of these occasions that you went to Lewiston in 1994 to see your lawyer . . . did you possess crack cocaine?"

At this point, defense counsel objected and a sidebar conference was held. Anticipating that the question would lead to further inquiry into the September 1994 Lewiston arrest (during which evidence was unlawfully seized), counsel argued that the subject was "very prejudicial" and, in any event, irrelevant to the charged conspiracy. The district court disagreed, stating, "It's certainly relevant to the question of conspiracy." The prosecutor then voiced his intention to introduce the subject of the September 1994 arrest. Defense counsel objected, contending that the previously-suppressed evidence was of little probative value and unduly prejudicial.

---

1. Before Morla–Trinidad took the stand, the district court personally informed him that, if he testified in his own defense, the government

would have the opportunity to cross-examine him and might be permitted to introduce the subject of the September 1994 arrest.

The district court ruled in favor of the government, finding that, although the tainted evidence would be inadmissible as part of the government's case in chief, it was admissible to impeach Morla–Trinidad's testimony. The court observed:

This defendant has taken the stand. He's denied knowing Bubba Lagasse, he certainly denied having any involvement in the ... crack cocaine conspiracy during July to December [1994].

And so this is material and relevant evidence to show that his testimony is false. [T]he suppression issue [is] no longer relevant. So far as the relevance issue is concerned, this bears directly on his testimony.

The court acknowledged that the evidence was prejudicial, but found that it was not unfairly so.

Subsequently, the following exchange took place before the jury with Morla–Trinidad on the witness stand:

Q. [By the prosecutor] Mr. Trinidad, when you visited Lewiston, Maine, in 1994, did you ever possess crack cocaine?

A. Never, sir.

Q. Never once?

A. Never.

The prosecutor then elicited Morla–Trinidad's acknowledgment that he was stopped in September 1994, with another man, by Lewiston police; Morla–Trinidad stated, however, that he did not know the other man as "Bubba Lagasse." Morla–Trinidad denied that the police found a plastic baggie in his pocket, then stated that he did not know the baggie contained crack cocaine. He did acknowledge that the police discovered some $1,800 in his possession.

In its rebuttal case, the government called a police officer to testify about the events surrounding the September 1994 arrest, including the illegal seizure of cash and drugs. The government also called a state chemist who identified the seized drugs as crack cocaine. The drugs were admitted into evidence.

The jury convicted Morla–Trinidad of the charged conspiracy and the district court subsequently sentenced him to 324 months' imprisonment. This appeal ensued.

### III.

### Discussion

Morla–Trinidad contends that the impeachment of his testimony by the cross-examination and subsequent testimony concerning the tainted evidence obtained at the time of the September 1994 arrest constituted prejudicial error because his testimony on direct examination neither "opened the door" to this topic nor reasonably suggested inquiry into it on cross-examination. He argues that his testimony on direct regarding his alleged drug activities concerned only Driggers and Baez and did not fairly implicate the September 1994 arrest.

### A. Standard of Review

■ Determining the scope of cross-examination is a matter within the district court's discretion and will not be disturbed absent abuse. *United States v. Cassiere*, 4 F.3d 1006, 1019–20 (1st Cir.1993); *see O'Connor v. Venore Trans. Co.*, 353 F.2d 324, 326 (1st Cir.1965) (extent to which a court allows counsel to test witness's credibility on cross-examination will not be disturbed absent "plain abuse of discretion").

### B. Use of Tainted Evidence to Impeach

■ It is well-settled that evidence obtained in violation of the Fourth Amendment can be admitted for the limited purpose of impeaching a testifying criminal defendant's credibility.[2] *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954) (rejecting notion that a criminal defendant "can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths"). The so-called "impeachment exception" to the exclusionary rule reflects a

---

2. Tainted evidence illegally obtained from a defendant may not, however, be used to impeach trial witnesses other than the testifying defendant. *James v. Illinois*, 493 U.S. 307, 313, 110 S.Ct. 648, 652, 107 L.Ed.2d 676 (1990).

balance of values underlying that rule. *See James v. Illinois*, 493 U.S. 307, 311–12, 110 S.Ct. 648, 651–52, 107 L.Ed.2d 676 (1990) (acknowledging that the truth-seeking function of a criminal trial is limited by the goal of discouraging lawless searches and seizures). Thus, while defendants are "free to testify truthfully on their own behalf ... without opening the door to impeachment," *id.* at 314, 110 S.Ct. at 652–53, an "affirmative[ ] resort to perjurious testimony" may be exposed by impeachment with illegally obtained evidence, *Walder*, 347 U.S. at 65, 74 S.Ct. at 356.[3]

When a defendant opens the door to impeachment through his statements on direct, the government may try to establish that his testimony is not to be believed through cross-examination and the introduction of evidence, including tainted evidence, that contradicts the direct testimony.[4] *See Oregon v. Hass*, 420 U.S. 714, 716–17, 721–22, 95 S.Ct. 1215, 1218, 1220–21, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 223–225, 91 S.Ct. 643, 644–45, 28 L.Ed.2d 1 (1971); *Walder*, 347 U.S. at 63, 65, 74 S.Ct. at 355, 356. When the assertedly false testimony is first given on cross-examination, however, the trial judge must gauge how closely the cross-examination is connected with matters explored during direct before invoking the impeachment exception to the exclusionary rule. *See United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980).

In *Havens*, the Supreme Court held: a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt. *Id.* at 627–28, 100 S.Ct. at 1917. Thus, the government may not "smuggle[ ] in" the impeaching opportunity with a cross-examination that has "too tenuous a connection with any subject opened upon direct examination." *Id.* at 625, 100 S.Ct. at 1916; *see also United States v. Ruiz–Batista*, 956 F.2d 351, 352 n. 1 (1st Cir.), *cert. denied*, 506 U.S. 834, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992). Rather, the questions on cross must have been "suggested to a reasonably competent cross-examiner" by the defendant's direct testimony. *Havens*, 446 U.S. at 626, 100 S.Ct. at 1916.

Whether or not the defendant's direct testimony "reasonably suggests" inquiry on cross-examination about events involving tainted evidence is necessarily case specific. *See, e.g., Havens*, 446 U.S. at 628, 100 S.Ct. at 1917 (defendant's denial of involvement with the concealment of drugs reasonably suggested cross-examination about specific materials found for concealing the drugs); *United States v. Brandon*, 847 F.2d 625, 628–29 (10th Cir.) (denial of bringing of drugs into motel room triggered inquiry and introduction of defendant's bag, found in room, bearing traces of cocaine), *cert. denied*, 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988); *United States v. Grubbs*, 776 F.2d 1281, 1286–87 (5th Cir.1985) (assertion of legitimacy of insurance services "opened door" to impeachment with conversation implicating illegitimacy of business deal); *United States v. Palmer*, 691 F.2d 921, 922 (9th

---

3. This particular mode of impeachment falls within the general category of "impeachment by contradiction," which is not specifically treated in the Federal Rules of Evidence, *United States v. Cudlitz*, 72 F.3d 992, 996 n. 1 (1st Cir.1996), but is governed by common-law principles, *United States v. Perez–Perez*, 72 F.3d 224, 227 (1st Cir. 1995).

4. Here, Morla–Trinidad's travel to Maine and his possession of cocaine during that travel are "non-collateral" matters, *i.e.*, matters that are of consequence to this case. *See United States v. Andujar*, 49 F.3d 16, 26 (1st Cir.1995). Typically, only non-collateral matters such as these may be impeached (by contradiction) with extrinsic evidence. *See Perez–Perez*, 72 F.3d at 227; *United States v. Pisari*, 636 F.2d 855, 859 (1st Cir. 1981). *But see* Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6096 at 546–49 (1990) (suggesting that extrinsic contradiction on a collateral issue is permissible where a testifying *criminal defendant* opens the door to that issue); *see also United States v. Havens*, 446 U.S. 620, 624–25, 100 S.Ct. 1912, 1914–16, 64 L.Ed.2d 559 (1980) (stating that impeachment of a defendant with illegally obtained evidence is constitutionally permitted for non-collateral as well as collateral matters, but not discussing the effect of other evidentiary limitations).

Cir.1982) (assertion that cocaine was used for legitimate dental purposes permitted impeachment with personal-use cocaine paraphernalia); *see also United States v. Le-Amous,* 754 F.2d 795, 798 (8th Cir.) ("By painting a picture of himself, on direct examination, as a protector of young girls who encouraged alternatives to prostitution, the defendant invited cross-examination concerning particular instances of his conduct to the contrary during the relevant time frame.") (reviewing case not involving tainted evidence), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

■  Here, Morla–Trinidad testified on direct that he had seen only two of the government's witnesses previously, and, with regard to those two (Baez and Driggers), he specifically denied any drug-related activity. He also denied knowing his indicted codefendant, Peabody, or Bubba Lagasse, the person with whom he was stopped during the September 1994 arrest. Morla–Trinidad also stated on direct that, during the period of the charged conspiracy, he spent most of his time in Massachusetts and New York and traveled to Maine only once to see his attorney. He maintained that his only associate in Lewiston was a "woman friend."

Morla–Trinidad's testimony could be reasonably construed as both a contradiction of the government witnesses' testimony and a denial of any involvement in the crack cocaine ring underlying the charged conspiracy. *See Havens,* 446 U.S. at 628, 100 S.Ct. at 1917 (reasoning that defendant's testimony "could easily be understood as a denial of any connection with [incriminating evidence] and as a contradiction of [government witness's] testimony"). We think, and Morla–Trinidad concedes as much, that the prosecutor reasonably brought attention to Morla–Trinidad's direct testimony by exploring, on cross-examination, when and how often he traveled to Maine, with whom he met there, and for what purposes.

Morla–Trinidad's direct testimony also clearly implied a denial that he ever traveled to Lewiston carrying crack cocaine for distribution. Thus, the disputed question on cross-examination, "when you visited Lewiston, Maine, in 1994, did you ever possess crack cocaine?", was reasonably suggested by that implied denial. His subsequent categorical denial of the foregoing question subjected his testimony to proper impeachment, including the probing questions on further cross and the rebuttal testimony about the illegally seized crack cocaine and cash. *See United States v. Wood,* 982 F.2d 1, 4 (1st Cir.1992) (explaining that the trial judge enjoys discretion in deciding whether to admit rebuttal evidence).

■  Morla–Trinidad also suggests that the impeaching evidence was unfairly prejudicial and that the district court abused its considerable discretion under Fed.R.Evid. 403 when admitting it. *See Espeaignnette v. Gene Tierney Co.,* 43 F.3d 1, 5 (1st. Cir. 1994) (noting court's "considerable latitude" in determining the relative weight of probative value versus unfair effect). We disagree. The evidence was of undoubted probative value to Morla–Trinidad's credibility on issues material to the case. Moreover, the district court alleviated the danger of unfair prejudice by (1) insuring that information about the seized marijuana from the September 1994 arrest would not be conveyed to the jury, and (2) instructing the jury, on the government's suggestion, that it was to use the disputed evidence only to consider Morla–Trinidad's credibility, not as substantive proof of the crime charged,[5] *see United States v. Tejeda,* 974 F.2d 210, 214 (1st Cir.1992) (finding no abuse in trial judge's Rule 403 balancing, "particularly in light of the careful limiting instruction given by the district court").

In sum, we conclude that the district court did not abuse its discretion in permitting the government to impeach Morla–Trinidad's testimony with questions about the September 1994 arrest and the tainted evidence

---

5. In an apparent misreading of *Havens,* the government on appeal asserts that this limiting instruction was unnecessary and suggests that the evidence could have been used for substantive purposes. The assertion is clearly wrong. *See*

*Havens,* 446 U.S. at 627–628, 100 S.Ct. at 1916–17; *see also James v. Illinois,* 493 U.S. at 313 n. 3, 110 S.Ct. at 652 n. 3 (approving similar instruction).

obtained therefrom. Thus, we do not reach Morla–Trinidad's additional arguments that the evidence was also inadmissible under Fed.R.Evid. 404(b), and that the asserted error was not harmless.

## IV.

### Conclusion

For the reasons stated above, we *affirm* the judgment of the district court.